[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 752 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 753 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 754 
Artez Hammonds appeals from his conviction of capital murder, see § 13A-5-40(a)(3), Ala. Code 1975. Hammonds was tried before a jury on the charge that he intentionally murdered Marilyn Mitchell during the commission of a rape. Following a guilty verdict, the jury recommended, by an 12-0 vote, that Hammonds be sentenced to death by electrocution. On December 19, 1997, the trial court sentenced Artez Hammonds to death. This appeal followed. We affirm.
The State's evidence tends to show the following. In the spring of 1990, Marilyn Mitchell graduated from the University of Alabama school of nursing and moved to Dothan where she was to begin her nursing career and to marry. Ms. Mitchell was 5 feet, 1 inches tall and she weighed around 110 pounds. Her friends recalled that she was a cautious individual, and that she always kept her apartment doors locked. She moved into a townhouse in Dothan where she and her fianc~~~ intended to reside after they married later that summer. On May 14, 1990, Artez Hammonds and another individual delivered newly purchased bedroom furniture to Ms. Mitchell's townhouse and placed the furniture in the second floor master bedroom. On the evening of May 15, 1990, Ms. Mitchell's fianc~~~ came to the townhouse and discovered the front door unlocked. He heard water running in the upstairs bathroom and, as he climbed the stairs, he discovered Marilyn Mitchell's blood-soaked body lying in the hallway at the top of the stairs. He telephoned the police. The police investigation revealed that Marilyn *Page 755 
Mitchell was apparently in the downstairs kitchen baking a cake when she was attacked. There were no signs of forcible entry. When Ms. Mitchell's body was found at the top of the stairs, she was dressed only in a T-shirt, naked from the waist down, and she was lying on her back in a large pool of blood; her legs were spread wide apart. Forensic reports indicated that Ms. Mitchell had been repeatedly stabbed and cut with a knife in the neck and chest. The wounds to the neck perforated her jugular veins and carotid artery and caused massive bleeding. There were over 30 lacerations to the neck area, including a wound that severed the voice box. There was also evidence of ligature strangulation, possibly from Ms. Mitchell's T-shirt, which had been used to restrain her. In the opinion of the medical examiner, all of these wounds were inflicted while Ms. Mitchell was still alive. There were two extremely violent stab wounds to the chest area, one of which penetrated Ms. Mitchell's sternum and punctured her aorta. Another vicious stab wound to the chest actually cut through three ribs. The medical examiner opined that the stab wound that punctured the aorta was the wound that finally killed Ms. Mitchell. Swabs taken from Ms. Mitchell's vaginal and anal cavities indicated the presence of spermatozoa, although there was no evidence of anal penetration. Semen was also found on a paper tissue found in a bedroom next to a bed; the comforter on the bed was missing. Blood splatters were also found in the home. Evidence indicates that the attacker may have cleaned up after the attack, positioned the body, smoked a cigarette, and then flicked ashes on Ms. Mitchell's body. In addition to the comforter, Ms. Mitchell's engagement ring and approximately $400 were also apparently taken from the townhouse.
The police investigation continued for many years without success until, in 1996, the Alabama Department of Forensic Sciences conducted DNA testing on the semen samples recovered at the crime scene and discovered that the genetic characteristics of the tested samples were more likely to be found among black males than white males. This new information led police investigators back to the furniture delivery men. Police discovered that Artez Hammonds had been convicted for the attempted murder of another woman and that he was serving a 20-year sentence at Holman Prison. Because Hammonds was a convicted felon incarcerated in an Alabama penitentiary, a sample of his blood was drawn, pursuant to the Alabama combined DNA indexing system ("CODIS") program (see § 36-18-20, Ala. Code 1975, et seq.), and the sample was sent to the Alabama Department of Forensic Sciences for DNA analysis and comparison. The forensic scientists who conducted the DNA analysis testified that the DNA taken from Hammonds's blood sample matched the DNA contained in the semen found on the paper tissue, the spermatozoa found on the vaginal and anal swabs, and the bloodstains located on the inside of the door and baseboard of Ms. Mitchell's home.
Additionally, Hammonds's thumbprint was found on the telephone in the victim's bedroom. Testimony also revealed that after the murder Hammonds had in his possession a diamond ring similar in appearance to Ms. Mitchell's engagement ring; he later pawned the ring.
 I.
Hammonds argues that the trial court erred in not suppressing the DNA evidence obtained from the blood sample retrieved from him in 1996. Hammonds argues that the blood sample was taken in violation of his Fourth Amendment rights against an unlawful search and seizure. Specifically, Hammonds contends that the blood sample, which was drawn by Holman Prison personnel pursuant to the CODIS requirements and not pursuant to any warrant, was taken outside the administrative protocols created by the Alabama Department of Forensic Sciences (ADFS) for the taking and indexing of such samples from *Page 756 
prison inmates, and was thus taken in violation of hisFourth Amendment rights. Hammonds points to three specific instances of violations of the administrative protocols that, he argues, should have resulted in the suppression of the DNA evidence:
 1. Administrative protocols state that DNA blood samples are to be taken from state inmates at their in-processing, their prerelease processing, or during routine physical examinations. Hammonds's blood sample was drawn at the request of the Mr. John Hicks, the assistant director of the ADFS and director of the state DNA database program. Of the some 2,500 DNA samples taken from state inmates, his was the only sample to be so taken.
 2. Administrative protocols state that the blood samples of state inmates will be delivered to a contract company, Genetic Designs, for processing and inclusion in the state DNA database. In this case, the samples were sent directly the Birmingham ADFS laboratories for analysis.
 3. Section 36-18-25(d), Ala. Code, 1975, entitled "Collection of DNA samples from convicted persons" includes the words "Upon the refusal of any such person to so submit, the custodian of the incarceration facility shall require such submission as a mandatory condition of any temporary, partial, or limited release, including, but not limited to, work release, furlough, or other incentive release." Hammonds argues that those words give inmates the right to refuse to submit to the taking of a blood sample. Hammonds argues that, because he was not advised of his right to refuse the taking of the sample, the taking was unconstitutional.
The record reflects that, after the ADFS determined that it was likely that the perpetrator was a black male, the Dothan Police investigators discovered that Hammonds was one of two black males who had delivered furniture to the deceased's townhouse the day before the murder. Further investigation revealed that, subsequent to the murder, Hammonds had been convicted for attempted murder in an unrelated case, that he was being confined at Holman Prison, and that he had no blood sample on file in the Alabama DNA database. As a result of a request by the Dothan police, John Hicks, with the authorization of Carlos Rabren, the director of ADFS, requested that Holman Prison officials draw a sample of Hammonds's blood to include in the CODIS database and asked that the sample be sent to their Birmingham laboratories as soon as it was taken. The sample was drawn on May 6, 1996. Hammonds cooperated and did not resist or attempt to refuse to allow a blood sample to be drawn.
Provisions for the implementation of an Alabama DNA database were enacted by the Alabama Legislature in 1994 and are codified in § 36-18-20-39, Ala. Code 1975. The Legislature declared
 "That the Alabama Department of Forensic Sciences should be authorized and empowered to analyze, type, and record any and all genetic markers contained in or derived from DNA and to create a statewide DNA database system for collection, storage, and maintenance of genetic identification information as the same may pertain to the identification of criminal suspects."
§ 36-18-20(h), Ala. Code 1975.
The act authorized the director of the ADFS to:
 "(1) Collect, accept, analyze, test and store DNA samples.
"(2) Create, maintain, or exchange DNA records.
 "(3) Analyze, type, and record any and all genetic markers contained in or derived from DNA and to provide for the collection, storage, and maintenance of genetic identification information as the same may pertain to the identification or exclusion of criminal suspects."
§ 36-18-22, Ala. Code 1975. DNA testing was to be "conducted in a manner that is *Page 757 
compatible with procedures specified by the FBI." § 36-18-23, Ala. Code 1975. FBI protocols have no bearing on how samples are taken, but address only testing procedures.
One of the primary purposes for the establishment of this statewide DNA database was stated as follows:
 "Assisting federal, state, county, municipal, or local criminal justice and law enforcement officers or agencies in the putative identification, detection, or exclusion of persons who are the subjects of investigations or prosecutions of sex related crimes, other violent crimes, or other crimes in which biological evidence is received or recovered."
§ 36-18-24(a), Ala. Code 1975.
According to § 36-18-24, Ala. Code 1975,
 "The DNA database shall contain DNA records which the director shall deem necessary for the implementation of this article, and also shall contain DNA records of:
 "(a) Persons convicted after May 6, 1994 for a felony offense.
 "(b) Persons confined as of May 6, 1994, under a sentence of imprisonment or involuntary incarceration or confinement in a prison, jail, or other incarceration facility as a result of any felony conviction."
This provision included Artez Hammonds. According to § 36-18-25(a), Ala. Code 1975,
 "All persons convicted of a criminal offense as set out in Section 36-18-24 shall, when requested by the director, submit to the taking of a DNA sample or samples as may be specified by the director, provided, however, the director shall promulgate such rules and regulations as may be necessary for the purposes of ensuring that DNA samples are collected in a medically approved manner."
(Emphasis added.)
The issues raised by Hammonds concerning the effect state administrative protocols have on an inmate's constitutional rights and whether Hammonds had a constitutional right to refuse to submit to having his blood drawn for the purposes of adding to the CODIS database, are all matters of first impression in the State of Alabama.
In denying Hammonds's motion to suppress, the trial court wrote:
 "[Hammonds] does not challenge the constitutionality of this statute. It is axiomatic that `. . . the Constitution confers on the legislature plenary power to legislate except as restricted by the Constitution, State or federal.' Ex parte Foshee, 246 Ala. 604, 21 So.2d 827, 829, (1945). Additionally, courts are to construe statutes as constitutional, where possible. Decatur Laboratories, Inc. v. Sizemore, 564 So.2d 976, 977 (Ala.Civ.App. 1990).
 "Instead, [Hammonds] raises a constitutional challenge as to the application of the statute to him. [Hammonds] argues that the manner in which his blood was taken violates his Fourth Amendment right to be free from an unlawful search and seizure. Further, [Hammonds] contends that the statute provides for a right of refusal, about which he was not notified.
 "No Alabama cases have been cited to this Court, nor none found, which address Alabama's CODIS Statute. This appears to be an issue of first impression in Alabama. However, numerous Federal Courts have addressed the Fourth Amendment issue as it relates to similar CODIS statutes in neighboring states.
 "In Jones v. Murray, 962 F.2d 302, 307
(4th Cir. 1992), cert. denied, 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992), the Court upheld a similar Virginia statute against a Fourth Amendment challenge, stating:
 "`Thus, in the case of convicted felons who are in custody of the Commonwealth, we find that the minor intrusion *Page 758 
caused by the taking of a blood sample is outweighed by Virginia's interest, as stated in the statute, in determining inmates' "identification characteristics specific to the person" for improved law enforcement.'
 "While the Court in Jones, supra, found that the taking of inmate blood was a search, no probable cause or individualized suspicion was needed.
 "This same conclusion was reached in Vanderlinden v. State of Kansas, 874 F. Supp. 1210 (D.Kan. 1995), where inmates challenged a Kansas CODIS statute on Fourth Amendment grounds. Also, see Kruger v. Erickson, 875 F. Supp. 583
(D. Minn. 1995), in which the Court was called upon to address a Fourth Amendment challenge to a Minnesota CODIS statute. The Court opined:
 "`Withdrawal of petitioner's blood here constituted a search and seizure; however, it was reasonable. The court concludes that the officials were "justified in requiring petitioner to submit to the test." The statute authorizing the test serves the legitimate governmental interest of assisting investigation and prosecution of sex crimes. The need to search here outweighs the minimal invasion which occurred. The manner in which officials withdrew petitioner's blood was reasonable.'
 "Also, see Rise v. State of Oregon, 59 F.3d 1556 (9th Cir. 1995), cert. denied 517 U.S. 1160, 116 S.Ct. 1554, 134 L.Ed.2d 656 (1996) and Boling v. Roman, 101 F.3d 1336 (10th Cir. 1996) for identical holdings.
 "Other courts have upheld these statutes from a Fourth Amendment constitutional attack under a different approach. In Jones v. Murray, 763 F. Supp. 842 (W.D. Va. 1991), and State of Washington v. Olivas, 122 Wn.2d 73, 856 P.2d 1076, (1993), DNA statutes were upheld on the basis of a `special needs' exception to the Fourth Amendment requirement.
 "In the case sub judice, an argument can be made that officials possessed, at the very least, individualized suspicion. The testimony reveals that Larry Huys [from the Alabama Department of Forensic Sciences] performed a statistical evaluation on the unknown tissue sample and discovered that the suspect was more likely to be black than white. This information was reported to Dothan [police] officer Bobby Sorrells. Prior to this time, Dothan Police had submitted samples of white suspects. Sergeant Sorrells reviewed the file for black suspects and learned that [Hammonds] had been to the deceased's townhouse in close proximity to the time of her death. Sergeant Sorrells also learned that [Hammonds] was in custody of the Board of Corrections for similar conduct. He, then, contacted the Department of Corrections and was informed that [Hammonds's] blood had not been drawn for DNA analysis and was not in the databank. Sergeant Sorrells requested that the director order [Hammonds] to submit to a DNA test as provided by § 36-18-25 of the statute.
 "[Hammonds] places great emphasis on a perceive `right of refusal.' This right of refusal is perhaps ephemeral. The statute is clear and its language mandatory that all persons convicted of or confined for felonies after May 6, 1994, shall submit to the taking of a DNA sample. Subsections (b) and (d) of § 36-18-25 address situations involving a possible refusal by the inmate to submit. Pursuant to subsection (b) there can be no refusal. If the person is serving any sentence of probation and refuses to submit to the test, `. . . the sentencing court shall order such submission as a mandatory condition of probation.' Again, in subsection (d), the language indicates that the inmate `shall submit,' and if he refuses, he will not be eligible for any incentive release. *Page 759 
 "This Court can rely on guidance from the case of Gilbert v. Peters, 55 F.3d 237, 239 (7th Cir. 1995). The Gilbert case upholds an Illinois CODIS statute from constitutional attack on Ex Post Facto grounds. The Court states:
 "`Finally, plaintiffs suggest that under the terms of the statute, which provides that blood samples are to be collected "prior to final discharge, parole, or release," they are subject to being held in prison past their release date. The Illinois Supreme Court's recent decision in Doe v. Gainer, 162 Ill.2d 15, 204 Ill. Dec. 652, 642 N.E.2d 114 (1994), cert. denied, 513 U.S. 1168, 115 S.Ct. 1139, 130 L.Ed.2d 1099 (1995), interpreting this language as a timing mechanism rather than an enforcement provision (in other words, requiring an inmate to submit a blood specimen while still in prison rather than after his release), is binding on this Court and forecloses plaintiff's argument.'
 "It is the opinion of this Court that Alabama's statute makes it mandatory that inmates submit to the DNA testing and any language suggesting a refusal is `a timing mechanism rather than an enforcement provision'; that is, the inmate shall provide the sample before he is released from prison. Section 36-18-20 declares:
 "`The provisions of this article are to be liberally construed so as to accomplish these purposes and to promote the same which are hereby declared to be the public policy of this state.'
 "To allow inmates to decide whether or not to submit to the test would, in effect, have `the tail wagging the dog,' and would defeat the purpose of the statute.
 "Therefore, [Hammonds's] arguments regarding Fourth Amendment claims and a right of refusal are misplaced. This Court finds, as numerous Federal Courts have found, that the taking of [Hammonds's] blood is outweighed by Alabama's interest in rapidly identifying repeat or habitually dangerous criminals.
 "Lastly, [Hammonds] argues that the Department of Forensic Sciences violated its own rules and regulations in administering the DNA testing of [Hammonds's] blood. Implicit in this argument is the suggestion that the manner in which [Hammonds's] blood was taken was unreasonable. This notion is intertwined in [Hammonds's] Fourth Amendment claim as well.
 "The evidence reveals that [Hammonds] was already imprisoned at the time the CODIS statute took effect. The Department of Forensic Sciences was delegated the authority to implement the program. In order to collect all inmate samples, the Department opted to take samples at intake and/or pre-release processing. At the time the request was made to take [Hammonds's] blood, he did not fall within either category. A special request was made for [Hammonds's] sample. According to Mr. Huys and Mr. Hicks, [Hammonds] was the first to be tested by specific request rather than normal intake and/or pre-release processing. The Department also performed the DNA analysis rather than send the sample to contractor, Genetic Designs. This process was atypical.
 "What is missing from this analysis is the role that the Department of Forensic Sciences must take pursuant to state law. Section 36-18-2 establishes the duties of the Department, which include the following:
 "`[The Department] shall cooperate with the coroners, sheriffs, and other police officers in Alabama in their investigations of crimes and deaths from unlawful, suspicious, or unnatural causes. The director shall within his discretion visit the scene of any crime in the state for the purpose of securing evidence for the state. The director shall furnish a certified copy of *Page 760 
his report of any investigation that the department conducts to the person or persons who ordered the investigation conducted.'
 "Additionally, § 36-18-25 mandates that `All persons convicted of a criminal offense . . . shall, when requested by the director submit to the taking of a DNA sample. . . .' [Hammonds] draws the wrong conclusion when he argues that the Department violated its policies and procedures in the taking and processing of [Hammonds's] blood internally, rather than sending it to Genetic Designs in the ordinary course of business. The Department was acting within the scope, responsibility, and duty prescribed by the aforementioned statutes. It is a general rule of law that a department's policies and procedures must yield to the express dictates of a statute. Ex parte Crestwood Hosp., 670 So.2d 45 (Ala. 1995). Ex parte Foshee, 246 Ala. 604, 21 So.2d 827 (1945). The department's approach to the taking of the blood and processing within the department was reasonable."
(R. Vol. 4, pp. 646-52).
The trial court was correct in its ruling; we adopt its excellent summary of the law and its rationale as our own. We find that the Alabama CODIS statute requirement that all persons convicted of a felony, or serving a sentence of imprisonment as a result of any felony conviction, after May 6, 1994, submit a blood sample for DNA processing is not a violation of Hammonds'sFourth Amendment right against an unreasonable search and seizure. Hammonds's rights pertaining to the seizure of his blood are outweighed by Alabama's interest in rapidly identifying repeat or habitually dangerous criminals. Jones v. Murray, 962 F.2d 302
(4th Cir. 1992), cert. denied, 506 U.S. 977 (1992). Likewise, we find no Fourth Amendment violations in the taking of Hammonds's blood sample contrary to ADFS protocol regulations. Those regulations were promulgated to assist the Department of Corrections and the Department of Forensic Sciences in the orderly and medically approved collection and processing of numerous blood samples from inmates. The regulations did not implement any constitutional or statutory protections for Hammonds or any other inmate. We hold that the ADFS protocol regulations provide no substantive rights to inmates, including Hammonds. United States v. Caceres, 440 U.S. 741 (1979). The CODIS statutes required that Hammonds submit a blood sample prior to his release from prison. That the Department of Forensic Sciences took Hammonds's blood sample and processed it contrary to their protocol regulations did not breach Hammonds's Fourth Amendment rights.
We also agree with the trial court that the language in §36-18-25, Ala. Code 1975, did not provide Hammonds with a right to refuse to submit to the DNA testing. The statute clearly makes it mandatory for all felon inmates to submit to DNA testing before their release; the language referring to a refusal does not impart a right, but is rather "a timing mechanism" for the submission of the sample. See, Gilbert v. Peters, 55 F.3d 237 (7th Cir. 1995). Hammonds's Fourth Amendment based complaints are without merit.
 II.
Hammonds argues that the trial court erred in admitting into evidence the results of DNA testing because, he argues, under Ex parte Perry, 586 So.2d 242 (Ala. 1991), the state presented insufficient evidence concerning the DNA population frequency statistical evidence. Hammonds argues that the record did "not support a holding that the techniques were held to be generally accepted in the scientific community" and that "the record was not sufficient to determine whether there was an error in the performance or interpretation of the test."
At the time of Hammonds's trial, § 36-18-30, Ala. Code 1975, not Perry, governed *Page 761 
the admissibility of DNA evidence. That section provides:
 "Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme Court in Daubert, et ux., et al., v. Merrell Dow Pharmaceuticals, Inc., decided on June 28, 1993."
This court has previously noted that for DNA evidence to be admissible under Daubert v. Merrell Dow Pharmaceuticals, Inc.,509 U.S. 579 (1993), it must be reliable and relevant. Maples v. State, 758 So.2d 1 (Ala.Cr.App. 1999).
 "The `reliability' prong of the Daubert admissibility test requires the party proffering the scientific evidence to establish that the evidence constitutes `scientific knowledge.' Daubert, 509 U.S. at 590, 113 S.Ct. at 2795. The evidence need not represent immutable scientific fact, but, rather, it must be derived by use of the `scientific method.' Id. The trial court should focus its inquiry on the expert's `principles and methodology, not on the conclusions that they generate.' Id. at 595, 113 S.Ct. at 2797. Thus, the reliability inquiry should address the `scientific validity' of the principle asserted, that is whether the `principle supports what it purports to show.' Daubert, 509 U.S. at 590 n. 9, 113 S.Ct. at 2795 n. 9.
 "In assessing reliability, trial courts should look to several guiding factors, including: (1) whether the `theory or technique . . . has been . . . tested'; (2) whether the `theory or technique has been subjected to peer review and publication'; (3) whether the technique's `known or potential rate of error . . . and . . . standards controlling the technique's operation' are acceptable; and (4) whether the theory or technique has gained `general acceptance' in the relevant scientific community. Id. at 593-94, 113 S.Ct. at 2796-97.
 "The `relevance' prong of the Daubert admissibility test requires the party proffering the scientific evidence to establish that the evidence `assist[s] the trier of fact to understand the evidence or to determine a fact in issue.' Daubert, 509 U.S. at 591, 113 S.Ct. at 2796 (quoting Rule 702, Fed.R.Evid.). The trial court should focus on the connection between the proffered scientific evidence and the factual issues. Id. at 591-92, 113 S.Ct. at 2795-96. Thus, the relevance inquiry should address the `fit' between what the scientific principles and methods are supposed to show and what must be shown to resolve the factual dispute at trial. Id.
". . . .
 ". . . Unlike Perry, 586 So.2d at 250, Daubert does not require the accuracy of the testing in the particular case to be assessed at the admissibility stage."
Turner v. State, 746 So.2d 355, 358-59 (Ala. 1998).
There are two determinations that must be made with respect to the reliability of the DNA population frequency statistical evidence. First, the population databases must be scientifically valid. Second, the method used to calculate the frequencies must be scientifically valid. United States v. Gaines, 979 F. Supp. 1429,1440 (S.D. Fla. 1997). Evidence was presented during the Perry hearing that indicated that the databases created by the ADFS were created in accordance with FBI protocol, were subjected to peer review, and were subjected to a comparison with databases from surrounding states. Evidence indicated that the FBI method for creating databases has been used for years and has been generally accepted in the scientific community. Likewise, evidence was presented that indicated that the methodology used in calculating the frequencies was in *Page 762 
accordance with the Hardy-Weinberg equilibrium[1] method and the recommendations of the National Research Council (NRC)[2]. Comparative testing validated the testing results. We especially note the trial court's questioning of Dr. Dedmon, a professor at The George Washington University and a forensic scientist with the FBI DNA laboratory for many years:
 "A: . . . I believe at this time the methods used in this particular case are the methods recommended by the National Research Council. The methods that have been used for many years and have the stamp of the National Research Council, which has spent approximately two years a second time in looking at all these issues and looking at all of the data and papers produced over the last 10 years. The methods used in this case are the methods recommended by the National Research Council.
 "Q: These would be the methods you would use in the FBI lab? Is that correct, on population statistics?
 "A: Yes. The method that I would use, the methods that Alabama would use are the same.
"Q: They are the same?
"A: Yes.
". . . .
 "Q: Okay. Now. these population statistics or frequencies, can they produce reliable results?
 "A: Yes. Again, the population frequencies that are produced are estimates. But, as I pointed out in my testimony, the National Research Council provided some indication of what the error is or what the possible error is in the estimates obtained. So, one has to look at the range that these estimates could fall in. And, as I said, for extremely small frequencies, like obtained in this particular case, both the RFLP[3] and the PCR[4] testing done by the Alabama Department of Forensic Science, they basically said in the NRC, there is a 10-fold variation in either direction which would give you the range in which the true figure, true probability actually falls.
". . . .
 "Q: And, you are knowledgeable in that field, are you not, population statistic frequencies?
 "A: Yes. I have been doing that type of work for 10 years now.
 "Q: Okay. You reviewed Alabama's population statistics? Is that correct?
"A: Yes, I have.
 "Q: Okay. And, do you have an opinion as to whether the testing laboratory, that is two of them, Birmingham and Mobile, performed generally accepted scientific techniques without error in the actual performance or interpretation of these tests? That is, I am asking you about the population frequency statistics *Page 763 
now versus performing the actual tests on the DNA.
 "A: Yes. I believe the methods they used and the results obtained are correct. Again, they produce estimates and all estimates have some error. But, the possible errors that could exist, the possible range of values that in either direction from that estimate are known. So, I certainly . . . they followed the proper procedure to come up with their answers.
 "Q: Okay. And, these would have been procedures that you, yourself, would have used in the FBI lab?
"A: Yes. Exactly the same procedures.
 "Q: Are there any internal controls, review process, with respect to the FBI lab or the Alabama lab that would indicate error or to prevent error?
 "A: There are certainly reviews in many different ways. For instance, the databases from the Alabama Department of Forensic Sciences can be looked at and studied to determine if the databases are suitable, both in size and in the distribution of the frequencies that are present in that database. I have read a report by a noted scientist, a population geneticist from the University of Texas, who has analyzed the Alabama databases and [who found them] suitable for the use in the purpose they use them for. There is also the review process whereby other individuals reviewed results after they have been obtained by a particular examiner. That is something done in the FBI and something done in the Alabama Department of Forensic Science.
"Q: Is that an administrative review?
 "A: I would say it would be more than an administrative review; it would be a technical review. You would do more than just read the report and make sure the words were spelled properly and make sense and so forth. Someone would actually go back and look at the results, the data produced during the testing, and that would be a technical review.
 "Q: What about the laboratory itself; are there procedures in place to prevent error?
 "A: Well, the protocols are designed, these specific procedures that make up a particular test, are designed to prevent — there are controls built into the procedure that would allow you to detect error. Typically errors will come through some sort of sample handling error, sample mix-up, contamination. And, procedures are designed and controls present are designed to prevent that from happening or detect that if in fact it were to happen."
(R. Vol. 32, pp. 477-82.)
The evidence presented at trial indicates that the procedure for determining DNA population frequency statistics used by the Mobile and Birmingham laboratories of the ADFS had been tested, had been subjected to peer review and publication, had a known rate of error, had adequate quality controls, and were generally accepted in the scientific community. Thus, the trial court correctly determined that the population frequency statistics were reliable and relevant in establishing Hammonds's identity as the perpetrator of the murder and rape of Marilyn Mitchell.
Because the State established both the reliability and relevance of the population frequency statistical evidence, as required by § 36-18-30, Ala. Code 1975, the trial court properly admitted the DNA evidence at trial. Daubert v. Merrell Dow Pharmaceuticals, Inc., supra; Turner v. State, supra.
 III.
Hammonds argues that the trial court erred when it denied a request for a mistrial and, instead, gave the jury a curative instruction after the prosecutor, Doug Valeska, made what Hammonds says was a direct comment in front of the jury on Hammonds's right to remain silent. *Page 764 
At the beginning of the presentation of the state's case, during Hammonds's cross-examination of a state witness, the following took place:
 "Q [Defense counsel]: Let's say there's a phone next to the wall on the floor. You wouldn't have thought anything at all about sitting down and picking up that phone and putting [it on a nightstand], would you?
"A: No.
 "Q: Mr. Hammonds would have done the same thing, wouldn't he?
"MR. VALESKA: Objection. He can't testify —
"THE COURT: Sustained.
 "MR. VALESKA: — what Mr. Hammonds would do. Let him testify."
(R. 219.) At that point, defense counsel asked to approach the bench and made a motion for a mistrial based on Mr. Valeska's comment. The trial court held a hearing outside the presence of the jury and ascertained from the prosecutor that he was, indeed, referring to the defendant when he made the comment, "Let him testify." The trial court declared that the prosecutor's statement was an improper comment on the defendant's right to remain silent, but denied Hammonds's request for a mistrial and, instead, gave an immediate curative instruction. When the jury was brought back into the courtroom, the trial court gave the following instruction:
 "THE COURT: Ladies and gentlemen of the jury, there was a statement made by the Prosecution, [and] an objection by the Defense, which was sustained. The remark, and I'm not sure in which manner it was intended, but it basically said, `Let him testify.' It can be taken several ways, but such remarks are improper, and the jury should disregard that remark by Mr. Valeska. Statements of counsel, as I told you, are not any evidence in this case and should not be used by you or considered by you as evidence. Under the law, the Defendant has the privilege to testify in his own behalf or not. He cannot be compelled to testify against himself, and . . . no presumption of guilt or innocence of any kind should be drawn from his failure to testify."
(R. 228.)
Hammonds argues that the trial court's instruction did not sufficiently comply with the requirements of caselaw to prevent a reversal. Hammonds cites the following language from Ex parte Wilson, 571 So.2d 1251, 1265 (Ala. 1990): "In giving a curative instruction on the defendant's right not to testify, the trial judge should read the statute[5] and explain thoroughly and immediately to the jury that the defendant's failure to testify in his own behalf shall not create any presumption against him." (Emphasis added.) Hammonds argues that, because the trial judge did not "read the statute," his curative instruction was incomplete.
Our discussion of this conduct by the prosecutor must begin with established principles of American jurisprudence.
 "[I]n all criminal prosecutions, the accused shall not be compelled to give evidence against himself. Alabama Constitution, Art. I, § 6. . . .
 "The United States Supreme Court has held that the Fifth and Fourteenth Amendments to the United States Constitution are also violated when a comment is made by the prosecutor on the accused's silence. Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1965). . . . *Page 765 
 "In a case where there has been a direct reference to a defendant's failure to testify and the trial court has not acted promptly to cure that comment, the conviction must be reversed. The federal cases have held that `a statement by a prosecutor is improper if it was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify.' Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566
(1988)."
Ex parte Wilson, 571 So.2d 1251, 1261 (Ala. 1990).
A reversal may be prevented if the trial court sustains an objection to the improper comment and promptly and appropriately instructs the jury as to the impropriety of the remark. Ex parte Wilson, 571 So.2d at 1265.
 "In determining whether the curative instructions have eradicated the prejudice caused by the improper remark, each case must be considered on its own facts and circumstances. Whitt [v. State], 370 So.2d [736], at 739 [(Ala. 1979).] The `type of remark, whether reply in kind or not, whether promptly objected to, and the appropriateness of the trial judge's instructions' shall be considered. Whitt, 370 So.2d at 739."
Bailey v. State, 717 So.2d 3, 5 (Ala.Crim.App. 1997).
Hammonds complains that, under Ex parte Wilson, the trial judge's instructions were incomplete because he failed to "read the statute" to the jury. However, we note that, in the next sentence of the opinion, the Alabama Supreme Court set out its suggestion for the minimum requirements for curative instructions when an objection has been made to an improper direct comment on a defendant's failure to testify:
 "`We suggest that, at a minimum, the trial judge must sustain the objection, and should then promptly and vigorously give appropriate instructions to the jury. Such instructions should include that such remarks are improper and to disregard them; that statements of counsel are not evidence; that under the law the defendant has the privilege to testify in his own behalf or not; that he cannot be compelled to testify against himself; and, that no presumption of guilt or inference of any kind should be drawn from his failure to testify. With appropriate instructions, we hold that the error of the prosecutor's remarks will be sufficiently vitiated so that such error is harmless beyond a reasonable doubt.'
 "A curative instruction in a situation of this type, to be of any value, must be given immediately after the harmful statement is made. Further, where there can be any reasonable doubt as to the particular statement in question, the statement should be explicitly identified to the jury so that it can know what must not be considered. Anything less can in no way cure the error."
Ex parte Wilson, 571 So.2d at 1265, quoting Whitt,370 So.2d at 739. (Citations omitted.)
A review of the trial judge's instructions shows that the trial judge followed the instructions of the Alabama Supreme Court to the letter. His instruction was given immediately after the improper remark was made; he sustained the defendant's objection; he identified the remark to the jury; and he instructed the jury that the remark was improper and that it should be disregarded and he completely explained the defendant's right to remain silent and that any presumption or inference of guilt could not be drawn from the exercise of that privilege. Because of the trial judge's complete and timely instruction, the error created by the prosecutor's improper remark was vitiated so as to render the error harmless. Bush v. State, 695 So.2d 70, 134 (Ala.Cr.App. 1995). *Page 766 
 IV.
Hammonds argues that the trial court erred when it denied his motion for a mistrial during the prosecutor's closing argument. Hammonds argues that the prosecutor violated the court's order not to mention the fact that at the time of the trial Hammonds was in prison for a prior conviction for attempted murder when he made the following closing argument:
 "[L]ike he said, the only person he was having sex with then on May 15 was . . . It was from the statement he gave — You made a big mistake, Artez, you convicted yourself — in the statement he gave to the police officers; `I wasn't having sex with anybody but . . .' Who? `Suwana, my wife.' That tells us about Artez. `Was your wife pregnant, at that time?' `No, she wasn't pregnant.' He didn't even know his wife was pregnant, carrying his child. He couldn't keep the stories straight in prison and the detective said, `You said your son was born in September. She had to be pregnant.' `Oh, that is right. She was pregnant.'"
(R. Vol. 34, p. 857.)
At the beginning of opening statements, the trial court ordered the prosecutor not to go into Hammonds's prior convictions:
 "THE COURT: You can't say anything about him being in prison right now or any convictions.
"MS. NEMISH [Defense counsel]: Right.
 "MR. VALESKA [Prosecutor]: Wait a minute. At what point in time do we take this up? I plan to call CODIS people and I plan to put on people in the penitentiary that drew his blood; how do I bring in CODIS where we ran his numbers from the CODIS system through the penitentiary?
 "THE COURT: This is opening statements. What you say is not evidence and we will take up the evidentiary part when we get to it. You can take up CODIS without going in great detail that he was at Holman Prison or drew his blood; you don't have to mention that. You can explain it without going into that in detail."
(R. Vol. 24, pp. 2768-69.) The trial court gave the prosecutor permission to use "Escambia County" as a euphemism for "Holman Penitentiary" during his opening statement. The trial court told the prosecutor that he would not be allowed to introduce any evidence about "subsequent convictions or bad character evidence as relates to crack cocaine or marijuana" when introducing Hammonds's statements. (R. Vol. 29, p. 10.) Later during the trial, as the prosecutor was ready to call as witnesses prison guards at Holman Penitentiary who were to testify about drawing Hammonds's blood for DNA testing, the trial court modified its order:
 "THE COURT: Okay. This is my ruling. The State will not go into any subsequent conviction of the Defendant, Artez Hammonds; will not go into any bad character of the Defendant, Artez Hammonds, be it doing crack cocaine or marijuana or anything of that nature. And, all that relates to the statement that he gave. However, on the flip side of that, I cannot foresee a situation where the State, based on the witnesses coming up can do anything other than show that he was incarcerated. The State will be allowed to go into that, but not what for."
(R. Vol. 29, pp. 24-25.)
Throughout the testimony of state witnesses, both on the DNA evidence and the statement given to investigators by Hammonds, the prosecutor and his witnesses used the term "Escambia County" to describe where Hammonds was interviewed and where he had his blood drawn.
After the prosecutor made this statement in closing arguments, and after the trial court denied Hammonds's request for a mistrial, the trial court gave the jury the following instruction:
 "THE COURT: Ladies and Gentlemen of the Jury, I told you before and I will tell you again; you know what the lawyers *Page 767 
say to you is not evidence. It is not to be considered by you as evidence. What they tell you and what they are doing is arguing their case to you. They are submitting what they believe the evidence to be. They are attempting to draw certain inferences; what they say is just to assist you. But, it is not to be considered by you as any evidence in this case. And, the only evidence that you are to consider would be evidence that comes from this witness stand or any exhibits that were introduced and admitted into evidence. So, just keep that in mind, what the attorneys tell you is not evidence. You may proceed."
(R. Vol. 34, p. 859.)
A mistrial is a drastic remedy that should be used sparingly and only to prevent manifest injustice. Ex parte Thomas,625 So.2d 1156 (Ala. 1993). "A trial judge is allowed broad discretion in determining whether a mistrial should be declared because he is in the best position to observe the scenario, to determine its effect upon the jury, and to determine whether the mistrial should be granted." Berryhill v. State, 726 So.2d 297, 302 (Ala.Cr.App. 1998), quoting Dixon v. State, 476 So.2d 1236, 1240 (Ala.Cr.App. 1985). Our review of the record indicates that the trial judge did an admirable job in keeping counsel informed as to what they would be allowed to introduce into evidence and what they could and could not argue. In particular, the trial judge closely monitored the prosecutor's arguments to the jury, with particular attention to any attempt to introduce evidence of Hammonds's prior conviction for attempted murder. Had this trial judge interpreted the prosecutor's argument as a flouting of a prior court order, we have no doubt that the trial judge would have made those findings known on the record. A review of the record reveals no such findings; the trial judge merely denied the motion for a mistrial, gave the curative instruction, and ordered the prosecutor to proceed. Because of the efforts of all parties at trial to keep evidence of the prior conviction for attempted murder from the jury, we are not convinced that the prosecutor's mention of the word "prison" during his argument about Hammonds's statement to police investigators improperly allowed the jury to infer the existence of a prior conviction. That being the case, the prompt and thorough action by the trial judge in issuing a curative instruction to the jury as soon as the argument was made created a presumption against error. Walker v. State, 631 So.2d 294, 300
(Ala.Cr.App. 1993). Hammonds's motion for a mistrial was properly denied.
 V.
Hammonds argues that the trial court erred when it denied his motion for a change of venue. He argues that prejudicial pretrial publicity so saturated the community that it prevented him from receiving a fair trial in Houston County.
Before denying the change-of-venue motion, the trial court twice heard evidence on the extent of the publicity surrounding the murder. At the first evidentiary hearing in November 1996, Hammonds presented evidence from the major radio and television stations in the Houston County area, as well as from The Dothan Eagle, the local newspaper, all of which began presenting news stories the night of the murder and continued to publish the stories for weeks afterward. There were also several "anniversary" stories presented in the years the crime remained unsolved. New stories of the murder were again featured after Hammonds's indictment.
After the first hearing, the trial court denied the motion for change of venue with the following order:
 "Based on the testimony and exhibits introduced at the hearing on the motion to change venue, the Court finds the following facts relevant. It is certainly clear there was and continues to be widespread publicity concerning this case. A number of reporters in the media testified that the stories concerning *Page 768 
this case were factual and did not contain inflammatory statements. . . .
 "It is also important to note from the testimony that the alleged murder occurred May 15, 1990. At that time, there was intense media attention which subsided after a couple of weeks. With the exception of a few anniversary stories, there was no media attention concerning this case until approximately August 1996, when an indictment was returned against [Hammonds]. Since that time, the media began airing stories regarding [Hammonds]. However, six years transpired before the initial May 1990, stories and the August 1996, indictment.
". . . .
 "The right to a fair and impartial jury is guaranteed by the Sixth Amendment to the United States Constitution which states: `In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . . `This right is also preserved in Article 1, Section 6, of the Alabama Constitution of 1901. However, [Hammonds] has failed to meet his burden in affirmatively showing that pretrial publicity so saturated the community as to have a probable impact on the prospective jurors or that there is a connection between the publicity generated and the existence of actual juror prejudice. This is not to say that there may not be actual prejudice as determined during trial voir dire. Insofar as this is a capital murder case and, ever mindful of its duty to ensure a fair and impartial trial, the Court will reserve jurisdiction of this matter to such time as a jury venire can be impaneled and a determination be made as to whether or not actual prejudice exists. The Court has much discretion in allowing individual voir dire."
(R. Vol. 2, pp. 206-08.)
On May 2, 1997, the trial court allowed Hammonds to present additional evidence to show that prejudicial pretrial publicity had so saturated the community as to require a change of venue. In addition to recalling the representatives of several television and radio stations in the Houston County area, Hammonds presented testimony from a political science professor who had drafted and conducted a publicity survey of the residents of Houston County concerning their knowledge of the murder case. The conclusions of that survey indicated that 72% of the population of Houston County knew something about this particular case. A majority of those persons who knew something about the case learned it through the media. However, a vast majority of the respondents to the survey also indicated that, if they were jurors, they would be uncertain as to Hammonds's guilt or innocence. In denying Hammonds's request for a change of venue for a second time, the trial court wrote:
 "As previously stated in Mullis v. State, 545 So.2d 205, 208 (Ala.Cr.App. 1989): `The fact that there was widespread publicity is not sufficient to require a change of venue, and a qualified juror need not be totally ignorant of the facts in the case.' The burden is on the Defendant to prove `. . . that pretrial publicity deprived him of his right to a fair trial before an impartial jury and such burden is an extremely heavy one.' Coleman v. Kemp, 778 F.2d 1537. Again, in Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App. 1993), the Court opined:
 "`In order for a Defendant to show prejudice, the proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' (Emphasis supplied [in trial court's order].)
 "For the second time, [Hammonds] has failed to meet his burden in affirmatively showing that pretrial publicity so saturated the community as to have a probable impact on the prospective jurors or that there is a connection between the publicity generated and the existence of actual juror prejudice. In *Page 769 
fact, [Hammonds's] own survey indicates that approximately 70% of those surveyed were uncertain as to whether or not [Hammonds] is guilty of capital murder."
(R. Vol 3, p. 463.)
At trial, the venire was examined over a two-day period, both in panels and individually. All of the potential jurors were thoroughly questioned concerning their knowledge of the case and any biases they may have found based on their knowledge of the case. Those veniremembers who said they knew something of the case were subjected to individual questioning. Those jurors who felt that they could not be objective and base their decision on the evidence presented at trial, or could not follow the trial court's instructions, were removed from the venire.
"The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, `indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). "A defendant is entitled to a change of venue if he can demonstrate to the trial court that he cannot receive a fair and impartial trial in the county where he is to be tried." § 15-2-20, Ala. Code 1975; Nelson v. State, 440 So.2d 1130, 1131 (Ala.Cr.App. 1983).
 "`"There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pretrial publicity `has so saturated the community as to have a probable impact on the prospective jurors' and thus renders the trial setting `inherently suspect.' McWilliams v. United States, 394 F.2d 41 (8th Cir. 1968); Dobbert v. Florida, 432 U.S. 282 (1977). In this situation, a `pattern of deep and bitter prejudice' must exist in the community. Irvin v. Dowd, 366 U.S. at 727."'
 "`"The second situation occurs when the defendant shows `a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice.' McWilliams v. United States, supra."'"
Hyde v. State, [Ms. CR-95-2036, January 30, 1998] ___ So.2d ___, ___ (Ala.Cr.App. 1998), quoting Holladay v. State,549 So.2d 122, 125-26 (Ala.Cr.App. 1988). It is the first situation that Hammonds argues rendered Houston County "inherently suspect" as a venue and thus, a venue where he could not receive a fair trial.
 "Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.
 . . . The presumed prejudice principle is `rare[ly]' applicable, and is reserved for an `extreme situation.'"
Coleman v. Kemp, 778 F.2d 1487, 1490 (11th Cir. 1985) (citation omitted).
The evidence shows that the radio, television, and newspaper coverage of the murder in the Houston County area reached a substantial number of the citizens in the community. It is clear from the answers of those people in Hammonds's survey that many people within Houston County had heard about the murder, and that most had gained their knowledge through the local media coverage. However, we do not believe Hammonds has proved that the pretrial publicity was "prejudicial and inflammatory." A review of the news reports of the murder and then, years later, the reports of Hammonds's indictment and arrest shows that the pretrial reporting was factual and did not contain inflammatory or prejudicial commentary. Pretrial publicity that is purely factual in nature is acceptable and will not support a change of venue. Heath v. Jones, 941 F.2d 1126, 1135 (11th. Cir. 1991).
We also agree with the trial court that the lengthy period between the murder and trial lessened the impact of any potentially inflammatory pretrial publicity. *Page 770 
Heath v. Jones, supra; Patton v. Yount, 467 U.S. 1025
(1984).
Based on the foregoing, we hold that Hammonds was unable to show that the pretrial publicity so affected his trial to allow us to conclude that this is one of those extremely rare cases in which we should find inherent prejudice. Heath v. Jones,941 F.2d at 1136. The trial court correctly denied Hammonds's motion for a change of venue.
 VI.
Hammonds argues that the trial court erred when it denied a motion for a mistrial after the court asked a series of questions to two of the state's DNA expert witnesses. Specifically, Hammonds argues that the trial court impermissibly abandoned its neutrality by asking questions that he says should have been asked by the prosecutor, thus creating an impression that the trial court favored the prosecution.
The trial court asked the first witness mainly foundational questions concerning the reliability and scientific acceptability of the state's RFLP DNA testing procedure and of the population frequency databases used to compare those DNA test results. When the trial judge asked these questions of Dr. Dedmon, he asked them in the presence of the jury. (R. Vol. 32; pp. 474-83.) At the conclusion of the questioning, and after Hammonds objected and made his motion for a mistrial, the trial court instructed the jury as follows:
 "THE COURT: Ladies and Gentlemen, there is a matter I need to take up with you. Most of the questions are performed by the attorneys and performed adequately by the attorneys in this case. That is, the attorneys represent[ing] the State of Alabama and the attorneys representing [Hammonds]. Now, on this last witness, I did ask extensive questions, at least trying to educate myself concerning some of this for my own benefit. But, the fact that I asked these questions, I don't want you to draw any inferences from it one way or the other. I want to tell you this and tell you again that a judge is not permitted by law to express his opinion or comment on the effect of the evidence presented to you. A judge can ask questions and that is legal. A judge also does not decide the credibility of any witness in a particular case. That is your job. Y'all are the fact finders. That is, you determine the facts and whatever weight and credit that you want to give to the testimony. Therefore, I want you to know any ruling, statement, or expression which may have been made by me during the course of this trial and during the course of that examination is not to be considered by you as any effort on my part to convey to you any feelings or opinion about the facts in this case or the credibility of any of the witnesses. I want y'all to understand that. But, I will tell you and go further and say to you that the attorneys may question witnesses and certainly the judge may question the witnesses as well. And, the questions I asked of this particular witness were to satisfy certain needs for myself, or at least to decide certain issues that were legal in nature and had nothing to do with the facts of this particular case."
(R. Vol. 32, pp. 487-88.) The trial judge explained to counsel that the pretrial hearing conducted to determine the admissibility of the DNA evidence had raised questions in his mind concerning the state's use of population statistics and frequencies and that he needed to ask the questions of the state's witness in order to clear those questions up in his own mind.
Later, after the attorneys had finished their questioning of Mr. Huys, the state's expert witness on PCR DNA testing, the trial judge excused the jury and made the following comment:
 "THE COURT: There are certain matters that I want to take up. Two weeks ago, we held a Perry hearing regarding the admissibility of DNA evidence, at *Page 771 
which time the State laid predicates for the introduction of this DNA evidence. Earlier today, I asked some questions of one scientist, I think Dr. Dedmon, concerning the threshold requirements regarding the admissibility of this evidence. Now, perhaps this may be attempting to be a legal scholar, but it has come to my mind that this technology is evolving. We all, that is the attorneys here, understand the requirements of Perry; that is the threshold requirement regarding the testing procedures and then those same three questions being asked regarding the population frequency statistics. Now, as we went through the testimony, it occurred to me that we were talking generally and have been talking, although we mix it in and it is somewhat cumulative. But, we are talking about DNA forensic analysis. There are two types of DNA forensic analysis; the latest being PCR testing, as I understand it. Now, because Mr. Decker [the defense counsel] is opposed to me asking these questions in front of the jury, I will send them out. But, just for the record, I want to go through these questions now with you as it relates PCR testing. And I may be being too particular or too picky, if you will, but, if you will, Mr. Huys, answer my questions.
(R. Vol. 33, pgs 652-53). The trial judge then questioned Mr. Huys on the reliability and scientific acceptability of PCR DNA testing and the population frequency statistic databases used to compare the DNA test results. Hammonds again objected to the questions, arguing that the court was impermissibly laying a foundation for the admissibility of the DNA evidence, which should have been done by the prosecution during the pretrial hearing.
 "The trial judge is more than a mere moderator and it is his duty to conduct an orderly trial and to make certain as far as possible that there is no misunderstanding of the testimony of witnesses. Thus, he may ask any question which would be proper for the prosecutor or defense counsel to ask so long as he does not depart from a standard of fairness and impartiality."
Sprinkle v. State, 368 So.2d 554, 562 (Ala.Cr.App. 1978).
 "The trial judge has a `solemn and sacred duty' to the development and establishment of truth `and in this connection it is always permissible for the court, and if it appears necessary for him to do so it is his duty, to propound to witnesses such questions as it is deemed necessary to elicit any relevant and material evidence, without regard to its effect, whether beneficial to the one party or the other.' Brandes v. State, 17 Ala. App. 390, 391, 85 So. 824 (1920) (citations omitted).
 "`The propriety of judicial examination of witnesses is to be determined by the circumstances of each case, and whether a given question or line of questioning by the trial judge is designed primarily to clarify issues and elicit facts, or is improper in nature and extent, must be decided in the light of the whole trial. While protracted or extended examination by the court is regarded unfavorably, at least where it tends to indicate the judge's bias or opinion, the question of whether the trial court unduly participated in an interrogation of witnesses is not to be determined by the number of questions which the trial court asked, and if all the questions were elicited for purposes recognized as proper on either direct or cross-examination, prejudice does not arise merely because the questions are asked by the court.' 23 C.J.S. Criminal Law § 991 (1961)."
Moore v. State, 502 So.2d 882, 885-86 (Ala.Cr.App. 1987).
The questions propounded by the trial court in this case were not accusatory or cross-examination type questions that amounted to an abdication of the duties of the trial court; they were not of the type condemned by this court in Richardson v. *Page 772 
State, 403 So.2d 293, 295 (Ala.Cr.App. 1981). Nor were the questions asked in such a manner as to indicate that the judge was biased or to indicate the judge's opinion. These questions were straightforward, clarifying questions dealing with the validity and scientific acceptability of the state's forensic evidence. These were questions the trial court had a duty to resolve before allowing the jury to consider the evidence in its factfinding role. The trial court did not err, nor did it abandon its neutral role, when it asked the prosecution witnesses the clarifying questions concerning the DNA testing and the validity of the population statistics. Johnson v. City of Birmingham, 338 So.2d 7
(Ala.Cr.App. 1976). Any effect on the jury that the length of the questioning might have had was ameliorated by the timely and proper instruction given by the trial court.
Hammonds also argues that the trial judge impermissibly "injected himself into the proceedings" when he asked Dr. Paredes, a forensic pathologist, a foundational question regarding whether a piece of evidence was in the same condition as when he last viewed it. Hammonds also complains that the trial judge improperly asked a witness who was a guard at Holman Penitentiary whether the room where they stored Hammonds's blood sample was secure. In a nonresponsive answer, the guard acknowledged that the storage area was "the deputy warden's office." Hammonds does not argue how these questions were error, but we will presume the same arguments he made concerning the DNA experts apply here. Because Hammonds did not object to these questions at trial, we review these issues for plain error only. Rule 45A, A.R.App.P. The failure to object at trial to alleged error weighs against any claim of prejudice on appeal. Kuenzel v. State, 577 So.2d 474,489 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886 (1991).
Having reviewed these questions in context with the other questions asked at trial, we find no plain error. Moore v. State,502 So.2d at 885-86. There is no indication that the questions asked by the trial judge had an unfair prejudicial impact on the jury's deliberations. Gaddy v. State, 698 So.2d 1100
(Ala.Cr.App. 1995), aff'd, 698 So.2d 1150 (Ala. 1997).
 VII.
Hammonds argues that the trial court erred in refusing to give the following requested instructions, which dealt with the DNA evidence:
 "Charge 47: The DNA evidence offered by the State stating there were several `matches' between the DNA of Marilyn Mitchell and the DNA of Artez Hammonds does not mean and should not be interpreted to mean, that there are one or more `exact' matches between the two individuals. The matches admitted into evidence are statistical probabilities only.
 "Charge 48: If you should find that all or any part of the DNA evidence admitted at trial is unworthy of belief, or you believe that it should be disregarded for any reason, you may do so as jurors.
 "Charge 49: It is entirely your responsibility to determine what weight, if any, is to be given to all or any part of the DNA evidence presented in this case.
 "Charge 50: If you do not believe beyond a reasonable doubt the DNA evidence presented in this case, you may completely disregard it.
 "Charge 51: The evidence necessary to show a `match' standing alone, does not indicate the frequency with which that DNA pattern might occur in the population.
 "Charge 52: The study of DNA and DNA testing, analysis, and its interpretation in terms of population frequencies is an ongoing, developing science.
 "Charge 53: Identification of an individual's characteristics through the use of DNA testing and analysis can only be accomplished with a `reasonable degree *Page 773 
of scientific certainty' not absolute certainty.
 "Charge 54: Genetic markers used to exclude members of a given population cannot determine race `absolutely.'
 "Charge 55: Numbers used to denote the frequency of the occurrence of one or more characteristics in a population such as one in a million, are no more than statistical estimates or probabilities into which is built a `ten-fold' variation or error rate, up or down.
 "Charge 56: You may not rely solely on the number of matches occurring between the two individuals compared in this case to determine guilt."
Hammonds argued to the trial court, and to this court, that these instructions should have been given to the jury because, he says, they set out the DNA evidence admissibility prerequisites of Ex parte Perry, 586 So.2d 242 (Ala. 1991). The trial court responded to this argument as follows:
 "THE COURT: Okay. You have your objection on the record. I will note for the record that [Hammonds's] requested Charges 47 — 56 were handed to the Court this morning. Pursuant to my order a month ago, written requested charges were to be submitted to the Court as least 24 hours in advance of argument. I have, nevertheless, considered [Hammonds's] requested Charges 47 — 56 and deem that they should be refused because they touch on the effect or credibility or importance of testimony, which I think invades the province of the jury. Now, there has been no requested charge in front of me dealing with or setting out the requirements of Perry. And, unless I see something before me, then I cannot rule on it and it is therefore denied."
(R. Vol. 34, pp. 824-25.) Before making this ruling, the trial court had gone over each requested instruction individually and ruled on each one, specifically noting that many of the proposed instructions were comments on the evidence that invaded the province of the jury. The trial court noted that it would give standard instructions on how the jury should review the evidence. (R. Vol. 34, pp. 809-25.)
The trial court was correct. Our review of the trial court's instructions shows that proposed Charges 48, 49, and 50 were adequately covered by the court's instructions.
 "Where the import and intent of a defendant's requested charge are covered in the oral instructions of the trial judge, the refusal of the requested charge does not constitute reversible error, even though the oral charge is not in the actual language of the request."
White v. State, 410 So.2d 135, 136 (Ala.Cr.App. 1981). The remainder of the proposed charges were correctly refused as being comments on the state of the evidence. Cameron v. State,615 So.2d 121, 125 (Ala.Cr.App. 1992). The refusal of these charges was not error.
 VIII.
Hammonds argues that the trial judge erred when he denied a motion to recuse himself based on an alleged appearance of bias. The allegation of an appearance of bias stems from the trial judge's previous role as city attorney for the City of Dothan from February 1986 to February 1993. Hammonds lists the following reasons for his claim of judicial bias:
 1. As the city attorney, the trial judge had the responsibility to represent the Dothan Police Department and on occasions, represented individual police officers[6];
 2. As city attorney, he was advised on the night the crime was committed or *Page 774 
the following day that Marilyn Mitchell had been murdered[7];
 3. The judge admitted that he had discussed the investigation informally with retired Capt. Larry Lynn, and he recalls asking questions of other officers about how the investigation was proceeding. He also may have discussed this case with then Police Chief Harold Locke[8];
 4. The judge also believed that he had discussed the investigation with his staff in the city attorney's office[9];
 5. The judge also revealed that he had probably represented police officers involved in the investigation in other litigation. He specifically recalled representing Fred Fellows and Sgt. Sorrells in a claim against Officer Jackie Mendheim, all of whom were involved in the murder investigation[10];
 6. The judge admitted that he had a close personal friendship with Lt. Kirkland, who was in charge of the investigation[11].
A judge is presumed to be impartial and unbiased. Ex parte Cotton, *Page 775 638 So.2d 870, 872 (Ala. 1994). "The burden is on the party seeking recusal to present evidence establishing the existence of bias or prejudice." Ex parte Grayson, 665 So.2d 986, 987
(Ala.Cr.App. 1995).
 "`"[T]he law will not suppose a possibility of bias or favor in a judge who is already sworn to administer impartial justice and whose authority greatly depends upon that presumption and idea."' Ex parte Balogun, 516 So.2d 606, 609 (Ala. 1987), quoting Fulton v. Longshore,
 156 Ala. 611, 46 So. 989 (1908). Any disqualifying prejudice or bias as to a party must be of a personal nature and must stem from an extrajudicial source. Hartman v. Board of Trustees of the University of Alabama, 436 So.2d 837 (Ala. 1983); Reach v. Reach, 378 So.2d 1115
(Ala.Civ.App. 1979). Thus,
 "`"`[T]he disqualifying prejudice of a judge does not necessarily comprehend every bias, partiality, or prejudice which he may entertain with reference to the case, but must be of a character, calculated to impair seriously his impartiality and sway his judgment, and must be strong enough to overthrow the presumption of his integrity.'"
 "`Ross v. Luton, 456 So.2d [249] at 254 [(Ala. 1984)], quoting Duncan v. Sherrill, 341 So.2d 946, 947 (Ala. 1977), quoting 48 C.J.S. Judges, § 82(b).'
 "Ex parte Melof, 553 So.2d 554, 557 (Ala. 1989). See also, Ex parte Cotton, 638 So.2d 870 (Ala. 1994)."
Ex parte Knotts, 716 So.2d 262, 264 (Ala.Crim.App. 1998).
Hammonds's evidence of bias or prejudice is mere supposition based on nothing more than the fact that the trial judge was acquainted with Dothan police officers. It should be noted that, while the trial judge may have known some of the police officers who were investigating this murder, and while he may have represented the Dothan Police Department in unrelated litigation when he was the Dothan City Attorney, the trial judge specifically denied ever having assisted the police in their investigation. According to the trial judge, he never advised, either formally or informally, any police officer about any aspect of the investigation. He never visited the crime scene, nor did he view any of the evidence or speak to family members. In short, his role as city attorney did not involve the trial judge in any aspect of the police department's criminal investigations during the time of this murder investigation.
(R. Vol. 11, pp. 110-11.) Any appearance of bias or prejudice caused by the trial judge's friendship with police officers is certainly offset by the trial judge's friendship with the defense counsel.
Our review of the record indicates that Hammonds has shown no reasonable basis for questioning the trial judge's impartiality. Therefore, he has failed to carry his burden of showing the trial judge erred in not recusing himself. Ex parte Cotton,638 So.2d at 873.
 IX.
In reviewing the sentence of death, as we are required to do by § 13A-5-53, Ala. Code 1975, we make the following findings: We have searched the record and have found no error in the sentencing proceedings adversely affecting Hammonds's rights. Pursuant to Rule 45A, Ala.R.App.P., we have searched the entire proceedings under review and found no plain error or defect that has, or probably *Page 776 
has, adversely affected any substantial right of Hammonds's.
The trial court found the existence of three aggravating circumstances: that the capital offense was committed while Hammonds was engaged in or attempting to commit rape, §13A-5-49(4); that at the time of the murder Hammonds was previously convicted of another capital offense or a felony involving the use or threat of violence to the person, § 13A-5-49(2); and that the capital offense was particularly heinous, atrocious, and cruel when compared to other offenses, § 13A-5-49(8).
The trial court considered evidence of three statutory mitigating circumstances: that the capital offense was committed while Hammonds was under the influence of extreme mental or emotional disturbance (the trial court stated that, while no evidence was offered in this regard, he noted that the number and pattern of the stab wounds indicated an uncontrolled rage), § 13A-5-51(2); that the capacity of Hammonds to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (the trial court stated that while there was little, if any, evidence tendered during the trial or penalty phase regarding this factor, he did consider the results of Hammonds's inpatient mental evaluation, which noted a previous diagnosis of intermittent explosive disorder and a Minnesota Multi-Phase Personality Inventory (MMPI) clinical profile that suggested asocial and antisocial behavior), § 13A-5-51(6); and Hammonds's age at the time of the crime (19 years old), § 13A-5-51(7a). The trial court also considered the following nonstatutory mitigating circumstances:
 1. That Artez Hammonds grew up in a destitute family and he was a child who was disadvantaged emotionally, economically, and socially;
 2. That Artez Hammonds's father was an alcoholic who brutalized, stabbed, and shot his mother; who hit him and berated him; and who subsequently committed suicide;
 3. That Artez Hammonds grew up in a family dominated by an abusive alcoholic and as a result he was deprived of meaningful role models and appropriate male influences;
 4. That Artez Hammonds's mother did not protect him from his abusive father and that his mother was sickly and was an ineffective parent;
 5. That Artez Hammonds participated in and attended church regularly as a child. He has demonstrated a change in his life through the study of scriptures and has become a Jehovah's Witness. He has encouraged other inmates to study and improve their lives.
 6. That Artez Hammonds has been a prisoner who has assisted the correctional officers by securing their safety. He had never caused any problems during his time in the Houston County jail;
 7. That Artez Hammonds was a respectful and attentive student in school; and
 8. That Artez Hammonds was a loving father and a loving husband.
It is the conclusion of this Court that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the record.
As required by § 13A-5-53(b)(3), we must determine whether Hammonds's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. After our review of the evidence, we note that Hammonds viciously murdered a young woman in her own home while he raped her. The fact that he left this young woman lying naked in a large pool of her blood and then flicked cigarette ashes on her only emphasizes the utter disregard for human life he displayed. We note that at the time of this trial, numerous Alabama courts have imposed death sentences upon convictions for rape-murder. Brooks v. State,695 So.2d 176, 184 (Ala.Cr.App. 1996), aff'd, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893, 118 S.Ct. 233 (1997). *Page 777 
It is the determination of this Court that death is the proper sentence in this case. There is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. The sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.
The judgment of the circuit court is affirmed.
AFFIRMED.
Long, P.J., and McMillan, Baschab, and Fry concur.
[1] The Hardy-Weinberg equilibrium is the condition, for a particular genetic locus and a particular population, with the following properties: allele frequencies at the locus are constant in the population over time, and there is no statistical correlation between the two alleles possessed by individuals in the population. Such a condition is approached in large randomly mating populations in the absence of selection, migration and mutation. Committee on DNA Technology in Forensic Science, National Research Council, DNA Technology in Forensic Science, (Prepublication Issue, 1992).
[2] The National Research Council, organized by the National Academy of Sciences in 1916, is the prinicipal operating agency of the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine.
[3] Restriction fragment length polymorphism: A type of DNA analysis technique that uses single-locus or multilocus probes to detect variation in a DNA sequence according to differences in the length of fragments created by cutting DNA with a restriction enzyme.
[4] Polymerase chain reaction: A type of DNA analysis which uses an in vitro process that yields millions of copies of desired DNA through repeated cycling of a reaction that involves the enzyme DNA polymerase.
[5] The statute referred to is § 12-21-220, Ala. Code 1975: "On the trial of all indictments, complaints or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request shall not create any presumption against him nor be the subject of comment by counsel. If the district attorney makes any comment concerning the defendant's failure to testify, a new trial must be granted on motion filed within 30 days from entry of the judgment."
[6] This allegation is based on the following:
 "Q: As your client, in your capacity as city attorney for the City of Dothan, were you representing the entity of the Police Department of Dothan?
"A: I did; many cases. Yes.
 "Q: Also in your capacity as city attorney, would you have occasion to represent some of the members of the police department individually?
"A: I have."
(R. Vol. 11, p. 107.)
[7] This allegation is based on the following:
 "Q: Do you know what date you became aware Marilyn Mitchell was murdered or became aware of this murder?
"A: Probably that night or the next day from the media.
 "Q: That kind of answers my next question. How, to the best of your recollection, did you become aware of that?
"A: Media."
(R. Vol. 11, p. 108.)
[8] This allegation is based on the following:
 "Q: Did you have occasions to discuss this investigation with any law enforcement at the city, either formally or informally?
 "A: Probably discussed it informally with retired Capt. Larry Lynn.
 "Q: Can you recall any other police officers or officials, law enforcement officials you may have discussed it with on a formal basis or any basis?
 "A: I don't know if I ever discussed it with [Lt.] Kirkland or not. I am sure I asked questions about how it was proceeding.
 "Q: Do you ever specifically recall discussing the case with the then Police Chief Harold Locke?
"A: I may have on occasions. I just don't recall."
(R. Vol. 11, pp. 108-09.)
[9] This allegation is based on the following:
 "Q: Do you recall ever discussing it with your own staff, Mr. White [the assistant city attorney]?
"A: I am sure we did."
(R. Vol. 11, pp. 109-10.)
[10] This allegation is based on the following:
 "Q: Would you recall, then, any of the officers you represented for various matters during this period of time when you were city attorney were also involved in the investigation of this particular case?
 "A: Probably some of them were. But, I don't know which ones. I don't know which officers were involved in this matter."
 "Q: Your Honor, during the period of time in your capacity as the city attorney, from this point, did you have an occasion to represent Officer Fred Fellows?
"A: I think so.
"Q: Officer Jackie Mendheim?
 "A: I am not sure about Jackie. I remember there was a claim one time on him, but I don't know about the litigation.
"Q: Or Officer Bobby Sorrells?
 "A: Sgt. Sorrells is here and I do recall being involved in a situation concerning Officer Sorrells or Sgt. Sorrells.
 "Q: Do you remember the nature of the particular representation with Officer Fellows?
"A: No.
 "Q: Do you remember the particular nature of your representation for Officer Sorrells?
 "A: I mean, I would imagine — lets go back to Fred Fellows and the other officers. I imagine it revolved around two things: one, inmate lawsuits or secondly, disciplinary actions concerning one officer or another. I am not saying Fred Fellows, but occasionally, whenever the chief took disciplinary action against an officer, it was up to me, at times."
(R. Vol. 11, pp. 115-16.)
[11] This allegation is based on the following:
 "Q: Would it be correct to say you have developed a special relationship with some of the police officers and that you were — you would consider [yourself] personal friends of theirs?
 "A: I think you need to define special relationship. But, are some of them friends of mine? Yes.
 "Q: Social friends of yours that you would consider good friends?
 "A: I guess the only one that I have a close relationship with is Lt. Kirkland. We do things together, yes. But, the other officers — I mean, I consider them friends, but, you know, don't really do things.
 "Q: Lt. Kirkland was also engaged in the investigation of this case, as well?
 "A: I assume he is. He is in charge of [the criminal investigation division]. But, I can't remember at what point he became in charge of CID."
(R. Vol. 11, pp. 114-15.)