861 So.2d 4 (2003)
D.B.
v.
STATE of Alabama.
CR-01-0616.
Court of Criminal Appeals of Alabama.
January 7, 2003.
Rehearing Denied February 21, 2003.
*7 Sandra Starne Hutchinson, Anniston; and Fred Lawton III, Anniston, for appellant.
William H. Pryor, Jr., atty. gen., and J. Thomas Leverette, asst. atty. gen., for appellee.
SHAW, Judge.
Pursuant to a plea agreement with the State, the appellant, D.B., pleaded guilty to one count of rape in the first degree, a violation of § 13A-6-61(a)(1), Ala.Code 1975; one count of sodomy in the first degree, a violation of § 13A-6-63(a)(1), Ala.Code 1975; and one count of burglary in the first degree, a violation of § 13A-7-5(a)(1), Ala.Code 1975. He was sentenced in accordance with the plea agreement to 25 years' imprisonment for each conviction, the sentences to run concurrently. Before pleading guilty, he expressly reserved the right to appeal the trial court's denial of three pretrial motions.
The record reflects that on April 7, 2000, delinquency petitions were filed against the appellant for rape, sodomy, and burglary. On May 10, 2000, upon motion of the State, the juvenile court transferred the cases to the circuit court for the appellant to be prosecuted as an adult. The appellant filed a notice of appeal from the transfer order. On July 27, 2000, while the appeal from the transfer order was pending in this Court, a Calhoun County grand jury returned three indictments against the appellant for the rape, sodomy, and burglary charges that were the subject of the transfer order. On August 17, 2000, the appellant orally moved to stay the proceedings in the circuit court pending the outcome of his appeal from the transfer order; the circuit court granted the motion. In an opinion issued on September 29, 2000, this Court affirmed the transfer order. See D.B. v. State, 796 So.2d 1144 (Ala.Crim.App.2000). The Alabama Supreme Court denied certiorari review, and a certificate of judgment was issued on April 27, 2001. On December 6, *8 2001, the appellant pleaded guilty to the charges in the indictments.
The rape, sodomy, and burglary arose out of one incident that occurred on May 3, 1997, at the residence of T.D. in Calhoun County. The appellant was T.D.'s next-door neighbor and was a suspect in the case from the beginning. However, the appellant was not initially arrested for the crimes, apparently because there was little or no evidence connecting him to the crimes. On July 7, 1999, the appellant pleaded guilty to two counts of reckless endangerment, violations of § 13A-6-24, Ala.Code 1975, for an incident that occurred on November 12, 1998, unrelated to the rape, sodomy, and burglary. The appellant was placed on two years of supervised probation for the reckless-endangerment convictions, and, on October 19, 1999, a DNA mouth swab was taken from the appellant. Subsequent testing revealed that the appellant's DNA matched semen found on a blanket at T.D.'s residence. The appellant was then charged with the rape, sodomy, and burglary.

I.
The appellant first contends that the trial court erred in denying his motion for funds to hire a DNA expert to independently test the blanket found at the scene of the crimes. He argues that, although his family provided funds for him to retain trial counsel, the circuit court should have considered him to be indigent and should have granted him funds to obtain a DNA expert because, he says, "there is a possibility that the blanket could contain DNA from another individual." (Appellant's brief at p. 22.) The appellant concedes in his brief to this Court that "he had a prior consensual sexual relationship with the victim" and that, therefore, his DNA may very well have been on the blanket, but he maintains that independent testing of the blanket by his own DNA expert may have revealed that the blanket also contained the "DNA of the actual perpetrator." (Appellant's brief at pp. 21-22.)
We agree with the appellant that "the fact that a friend or relative pays for an indigent defendant's counsel should not be considered in determining whether the defendant is entitled to funds for expert assistance," Ex parte Sanders, 612 So.2d 1199, 1201 (Ala.1993), and that the record indicates that the appellant was, in fact, indigent.[1] However, nothing in the record suggests that the trial court did not consider the appellant to be indigent when it denied his motion for funds. The mere fact that the appellant was indigent did not automatically entitle him to funds for expert assistance.
"[I]n order for an indigent defendant to be entitled to funds with which to hire an expert, the defendant must demonstrate a need for the funds." Smith v. State, 639 So.2d 543, 550 (Ala.Crim.App. 1993).
"[A] defendant, in order to be entitled to funds to pay for an expert, must show more than a mere possibility that he or she will receive useful assistance from the expert. Rather, the defendant must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial."
Dobyne v. State, 672 So.2d 1354, 1357 (Ala. 1995). "To meet this standard, the indigent *9 defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense." Ex parte Moody, 684 So.2d 114, 119 (Ala. 1996). The State does not have to pay for expert assistance if an indigent defendant offers "`little more than undeveloped assertions that the requested assistance would be beneficial.'" Ex parte Moody, 684 So.2d at 119, quoting Caldwell v. Mississippi, 472 U.S. 320, 323, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
In this case, the appellant failed to show a reasonable probability that a DNA expert would aid in his defense and that the denial of a DNA expert would have resulted in a fundamentally unfair trial. He offered nothing more than the mere possibility that independent testing of the blanket would reveal that the blanket contained the DNA of another person. Therefore, the trial court did not err in denying the appellant's motion for funds to hire a DNA expert.

II.
Second, the appellant contends that the trial court erred in denying his motion to suppress the DNA evidence because, he says, taking the DNA sample from him while he was on probation for the reckless-endangerment convictions was an unlawful search and seizure. Although not entirely clear, the appellant appears to argue that this Court's holding in Hammonds v. State, 777 So.2d 750 (Ala.Crim.App.1999), aff'd, 777 So.2d 777 (Ala.2000), that DNA samples taken pursuant to §§ 36-18-24 and 36-18-25, Ala.Code 1975, did not violate the Fourth Amendment, is not applicable to his case because, he says, the holding in Hammonds was limited to the taking of DNA samples from those persons convicted of felonies and did "not address the issue whether the taking of DNA evidence from a probationer, on probation for a misdemeanor, is proper." (Appellant's reply brief at p. 7.) This argument is meritless.
Section 36-18-25, Ala.Code 1975, provides, in part:
"(a) All persons convicted of a criminal offense as set out in Section 36-18-24 shall, when requested by the director [of the Alabama Department of Forensic Sciences] submit to the taking of a DNA sample or samples as may be specified by the director, provided, however, the director shall promulgate such rules and regulations as may be necessary for the purposes of ensuring that DNA samples are collected in a medically approved manner.
"(b) As of May 6, 1994, all persons serving any sentence of probation for any of the offenses set out in Section 36-18-24 shall, when requested by the director, submit to the taking of a DNA sample or samples as specified by the director. Upon the refusal of any such person to so submit the sentencing court shall order such submission as a mandatory condition of probation.
"(c) As of May 6, 1994, all persons convicted of any of the offenses set out in Section 36-18-24 shall be ordered to submit to the taking of a DNA sample or samples as specified by the director as a mandatory condition of any term of probation or suspended sentence which may be imposed by the sentencing court.
"(d) As of May 6, 1994, all persons convicted for any offense set out in Section 36-18-24 and under any sentence of confinement to any incarceration facility, shall, when requested by the director, submit to the taking of a DNA sample or samples as specified by the director. Upon the refusal of any such person to so submit, the custodian of the incarceration *10 facility shall require such submission as a mandatory condition of any temporary, partial or limited release, including, but not limited to, work release, furlough, or other incentive release.
"(e) As of May 6, 1994, all persons convicted of any of the offenses set out in Section 36-18-24, shall be ordered by the sentencing court to submit to the taking of a DNA sample or samples as may be specified by the director as part of the sentence to be imposed."
Section 36-18-24, Ala.Code 1975, provides, in pertinent part:
"The director is hereby authorized and empowered to create and establish a DNA database ...:
"....
"The DNA database shall contain DNA records which the director shall deem necessary for the implementation of this article, and also shall contain DNA records of:
"(a) Persons convicted after May 6, 1994 for a felony offense.
"(b) Persons confined as of May 6, 1994 under a sentence of imprisonment or involuntary incarceration or confinement in a prison, jail, or other incarceration facility as a result of any felony conviction.
"(c) Persons convicted after May 6, 1994 of any offense contained in Chapter 6, Title 13A, or as the same may be hereafter amended.
"(d) Persons convicted after May 6, 1994, of any attempt, solicitation, or conspiracy to commit any offense contained in Chapter 6, Title 13A, or as the same may be hereafter amended.
"(e) Persons convicted or sentenced after May 6, 1994, for any of the offenses enumerated above and serving a sentence of probation, suspended sentence, or other sentence or judgment not requiring immediate incarceration."
(Emphasis added.)
In Hammonds, this Court stated:
"Hammonds argues that the trial court erred in not suppressing the DNA evidence obtained from the blood sample retrieved from him in 1996. Hammonds argues that the blood sample was taken in violation of his Fourth Amendment rights against an unlawful search and seizure. Specifically, Hammonds contends that the blood sample, which was drawn by Holman Prison personnel pursuant to the CODIS requirements [Alabama combined DNA indexing system program, § 36-18-20 et seq.] and not pursuant to any warrant, was taken outside the administrative protocols created by the Alabama Department of Forensic Sciences (ADFS) for the taking and indexing of such samples from prison inmates, and was thus taken in violation of his Fourth Amendment rights....
"....
"The record reflects that, after the ADFS determined that it was likely that the perpetrator was a black male, the Dothan Police investigators discovered that Hammonds was one of two black males who had delivered furniture to the deceased's townhouse the day before the murder. Further investigation revealed that, subsequent to the murder, Hammonds had been convicted for attempted murder in an unrelated case, that he was being confined at Holman Prison, and that he had no blood sample on file in the Alabama DNA database. As a result of a request by the Dothan police, John Hicks, with the authorization of Carlos Rabren, the director of ADFS, requested that Holman Prison officials draw a sample of Hammonds's blood to include in the CODIS database and asked that the sample be sent to their *11 Birmingham laboratories as soon as it was taken. The sample was drawn on May 6, 1996. Hammonds cooperated and did not resist or attempt to refuse to allow a blood sample to be drawn.
"Provisions for the implementation of an Alabama DNA database were enacted by the Alabama Legislature in 1994 and are codified in §§ 36-18-20 through -39, Ala.Code 1975. The Legislature declared
"`That the Alabama Department of Forensic Sciences should be authorized and empowered to analyze, type, and record any and all genetic markers contained in or derived from DNA and to create a statewide DNA database system for collection, storage, and maintenance of genetic identification information as the same may pertain to the identification of criminal suspects.'
"§ 36-18-20(h), Ala.Code 1975.
"The act authorized the director of the ADFS to:
"`(1) Collect, accept, analyze, test and store DNA samples.
"`(2) Create, maintain, or exchange DNA records.
"`(3) Analyze, type, and record any and all genetic markers contained in or derived from DNA and to provide for the collection, storage, and maintenance of genetic identification information as the same may pertain to the identification or exclusion of criminal suspects.'
"§ 36-18-22, Ala.Code 1975. DNA testing was to be `conducted in a manner that is compatible with procedures specified by the FBI.' § 36-18-23, Ala.Code 1975. FBI protocols have no bearing on how samples are taken, but address only testing procedures.
"One of the primary purposes for the establishment of this statewide DNA database was stated as follows:
"`Assisting federal, state, county, municipal, or local criminal justice and law enforcement officers or agencies in the putative identification, detection, or exclusion of persons who are the subjects of investigations or prosecutions of sex related crimes, other violent crimes, or other crimes in which biological evidence is received or recovered.'
"§ 36-18-24(a), Ala.Code 1975.
"According to § 36-18-24, Ala.Code 1975,
"`The DNA database shall contain DNA records which the director shall deem necessary for the implementation of this article, and also shall contain DNA records of:
"`(a) Persons convicted after May 6, 1994 for a felony offense.
"`(b) Persons confined as of May 6, 1994, under a sentence of imprisonment or involuntary incarceration or confinement in a prison, jail, or other incarceration facility as a result of any felony conviction.'
"This provision included Artez Hammonds. According to § 36-18-25(a), Ala.Code 1975,
"`All persons convicted of a criminal offense as set out in Section 36-18-24 shall, when requested by the director, submit to the taking of a DNA sample or samples as may be specified by the director, provided, however, the director shall promulgate such rules and regulations as may be necessary for the purposes of ensuring that DNA samples are collected in a medically approved manner.'
"(Emphasis added [in Hammonds].)

*12 "The issues raised by Hammonds concerning the effect state administrative protocols have on an inmate's constitutional rights and whether Hammonds had a constitutional right to refuse to submit to having his blood drawn for the purposes of adding to the CODIS database, are all matters of first impression in the State of Alabama.
"In denying Hammonds's motion to suppress, the trial court wrote:
"`[Hammonds] does not challenge the constitutionality of this statute. It is axiomatic that "... the Constitution confers on the legislature plenary power to legislate except as restricted by the Constitution, State or federal." Ex parte Foshee, 246 Ala. 604, 21 So.2d 827, 829, (1945). Additionally, courts are to construe statutes as constitutional, where possible. Decatur Laboratory, Inc. v. Sizemore, 564 So.2d 976, 977 (Ala.Civ.App.1990).
"`Instead, [Hammonds] raises a constitutional challenge as to the application of the statute to him. [Hammonds] argues that the manner in which his blood was taken violates his Fourth Amendment right to be free from an unlawful search and seizure. Further, [Hammonds] contends that the statute provides for a right of refusal, about which he was not notified.
"`No Alabama cases have been cited to this Court, nor none found, which address Alabama's CODIS Statute. This appears to be an issue of first impression in Alabama. However, numerous Federal Courts have addressed the Fourth Amendment issue as it relates to similar CODIS statutes in neighboring states.
"`In Jones v. Murray, 962 F.2d 302, 307 (4th Cir.1992), cert. denied, 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992), the Court upheld a similar Virginia statute against a Fourth Amendment challenge, stating:
"`"Thus, in the case of convicted felons who are in custody of the Commonwealth, we find that the minor intrusion caused by the taking of a blood sample is outweighed by Virginia's interest, as stated in the statute, in determining inmates' `identification characteristics specific to the person' for improved law enforcement."
"`While the Court in Jones, supra, found that the taking of inmate blood was a search, no probable cause or individualized suspicion was needed.
"`This same conclusion was reached in Vanderlinden v. State of Kansas, 874 F.Supp. 1210 (D.Kan.1995), where inmates challenged a Kansas CODIS statute on Fourth Amendment grounds. Also, see Kruger v. Erickson, 875 F.Supp. 583 (D.Minn.1995), in which the Court was called upon to address a Fourth Amendment challenge to a Minnesota CODIS statute. The Court opined:
"`"Withdrawal of petitioner's blood here constituted a search and seizure; however, it was reasonable. The court concludes that the officials were `justified in requiring petitioner to submit to the test.' The statute authorizing the test serves the legitimate governmental interest of assisting investigation and prosecution of sex crimes. The need to search here outweighs the minimal invasion which occurred. The manner in which officials withdrew petitioner's blood was reasonable."
"`Also, see Rise v. State of Oregon, 59 F.3d 1556 (9th Cir.1995), cert. denied 517 U.S. 1160, 116 S.Ct. 1554, 134 *13 L.Ed.2d 656 (1996), and Boling v. Romer, 101 F.3d 1336 (10th Cir.1996) for identical holdings.
"`Other courts have upheld these statutes from a Fourth Amendment constitutional attack under a different approach. In Jones v. Murray, 763 F.Supp. 842 (W.D.Va.1991), and State of Washington v. Olivas, 122 Wash.2d 73, 856 P.2d 1076, (1993), DNA statutes were upheld on the basis of a "special needs" exception to the Fourth Amendment requirement.
"`In the case sub judice, an argument can be made that officials possessed, at the very least, individualized suspicion. The testimony reveals that Larry Huys [from the Alabama Department of Forensic Sciences] performed a statistical evaluation on the unknown tissue sample and discovered that the suspect was more likely to be black than white. This information was reported to Dothan [police] officer Bobby Sorrells. Prior to this time, Dothan Police had submitted samples of white suspects. Sergeant Sorrells reviewed the file for black suspects and learned that [Hammonds] had been to the deceased's townhouse in close proximity to the time of her death. Sergeant Sorrells also learned that [Hammonds] was in custody of the Board of Corrections for similar conduct. He, then, contacted the Department of Corrections and was informed that [Hammonds's] blood had not been drawn for DNA analysis and was not in the databank. Sergeant Sorrells requested that the director order [Hammonds] to submit to a DNA test as provided by § 36-18-25 of the statute.
"`[Hammonds] places great emphasis on a perceived "right of refusal." This right of refusal is perhaps ephemeral. The statute is clear and its language mandatory that all persons convicted of or confined for felonies after May 6, 1994, shall submit to the taking of a DNA sample. Subsections (b) and (d) of § 36-18-25 address situations involving a possible refusal by the inmate to submit. Pursuant to subsection (b) there can be no refusal. If the person is serving any sentence of probation and refuses to submit to the test, "... the sentencing court shall order such submission as a mandatory condition of probation." Again, in subsection (d), the language indicates that the inmate "shall submit," and if he refuses, he will not be eligible for any incentive release.
"`This Court can rely on guidance from the case of Gilbert v. Peters, 55 F.3d 237, 239 (7th Cir.1995). The Gilbert case upholds an Illinois CODIS statute from constitutional attack on Ex Post Facto grounds. The Court states:
"`"Finally, plaintiffs suggest that under the terms of the statute, which provides that blood samples are to be collected `prior to final discharge, parole, or release,' they are subject to being held in prison past their release date. The Illinois Supreme Court's recent decision in Doe v. Gainer, 162 Ill.2d 15, 204 Ill.Dec. 652, 642 N.E.2d 114 (1994), cert. denied, 513 U.S. 1168, 115 S.Ct. 1139, 130 L.Ed.2d 1099 (1995), interpreting this language as a timing mechanism rather than an enforcement provision (in other words, requiring an inmate to submit a blood specimen while still in prison rather than after his release), is binding on this Court and forecloses plaintiff's argument."

*14 "`It is the opinion of this Court that Alabama's statute makes it mandatory that inmates submit to the DNA testing and any language suggesting a refusal is "a timing mechanism rather than an enforcement provision"; that is, the inmate shall provide the sample before he is released from prison. Section 36-18-20 declares:
"`"The provisions of this article are to be liberally construed so as to accomplish these purposes and to promote the same which are hereby declared to be the public policy of this state."
"`To allow inmates to decide whether or not to submit to the test would, in effect, have "the tail wagging the dog," and would defeat the purpose of the statute.
"`Therefore, [Hammonds's] arguments regarding Fourth Amendment claims and a right of refusal are misplaced. This Court finds, as numerous Federal Courts have found, that the taking of [Hammonds's] blood is outweighed by Alabama's interest in rapidly identifying repeat or habitually dangerous criminals.
"`Lastly, [Hammonds] argues that the Department of Forensic Sciences violated its own rules and regulations in administering the DNA testing of [Hammonds's] blood. Implicit in this argument is the suggestion that the manner in which [Hammonds's] blood was taken was unreasonable. This notion is intertwined in [Hammonds's] Fourth Amendment claim as well.
"`The evidence reveals that [Hammonds] was already imprisoned at the time the CODIS statute took effect. The Department of Forensic Sciences was delegated the authority to implement the program. In order to collect all inmate samples, the Department opted to take samples at intake and/or pre-release processing. At the time the request was made to take [Hammonds's] blood, he did not fall within either category. A special request was made for [Hammonds's] sample. According to Mr. Huys and Mr. Hicks, [Hammonds] was the first to be tested by specific request rather than normal intake and/or pre-release processing. The Department also performed the DNA analysis rather than send the sample to contractor, Genetic Designs. This process was atypical.
"`What is missing from this analysis is the role that the Department of Forensic Sciences must take pursuant to state law. Section 36-18-2 establishes the duties of the Department, which include the following:
"`"[The Department] shall cooperate with the coroners, sheriffs, and other police officers in Alabama in their investigations of crimes and deaths from unlawful, suspicious, or unnatural causes. The director shall within his discretion visit the scene of any crime in the state for the purpose of securing evidence for the state. The director shall furnish a certified copy of his report of any investigation that the department conducts to the person or persons who ordered the investigation conducted."
"`Additionally, § 36-18-25 mandates that "All persons convicted of a criminal offense ... shall, when requested by the director submit to the taking of a DNA sample...." [Hammonds] draws the wrong conclusion when he argues that the Department violated its policies and procedures in the taking and processing of [Hammonds's] blood internally, rather than sending *15 it to Genetic Designs in the ordinary course of business. The Department was acting within the scope, responsibility, and duty prescribed by the aforementioned statutes. It is a general rule of law that a department's policies and procedures must yield to the express dictates of a statute. Ex parte Crestwood Hosp., 670 So.2d 45 (Ala.1995). Ex parte Foshee, 246 Ala. 604, 21 So.2d 827 (1945). The department's approach to the taking of the blood and processing within the department was reasonable.'
"(R. Vol.4, pp. 646-52).
"The trial court was correct in its ruling; we adopt its excellent summary of the law and its rationale as our own. We find that the Alabama CODIS statute requirement that all persons convicted of a felony, or serving a sentence of imprisonment as a result of any felony conviction, after May 6, 1994, submit a blood sample for DNA processing is not a violation of Hammonds's Fourth Amendment right against an unreasonable search and seizure. Hammonds's rights pertaining to the seizure of his blood are outweighed by Alabama's interest in rapidly identifying repeat or habitually dangerous criminals. Jones v. Murray, 962 F.2d 302 (4th Cir.1992), cert. denied, 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992). Likewise, we find no Fourth Amendment violations in the taking of Hammonds's blood sample contrary to ADFS protocol regulations. Those regulations were promulgated to assist the Department of Corrections and the Department of Forensic Sciences in the orderly and medically approved collection and processing of numerous blood samples from inmates. The regulations did not implement any constitutional or statutory protections for Hammonds or any other inmate. We hold that the ADFS protocol regulations provide no substantive rights to inmates, including Hammonds. United States v. Caceres, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). The CODIS statutes required that Hammonds submit a blood sample prior to his release from prison. That the Department of Forensic Sciences took Hammonds's blood sample and processed it contrary to their protocol regulations did not breach Hammonds's Fourth Amendment rights.
"We also agree with the trial court that the language in § 36-18-25, Ala. Code 1975, did not provide Hammonds with a right to refuse to submit to the DNA testing. The statute clearly makes it mandatory for all felon inmates to submit to DNA testing before their release; the language referring to a refusal does not impart a right, but is rather `a timing mechanism' for the submission of the sample. See, Gilbert v. Peters, 55 F.3d 237 (7th Cir.1995). Hammonds's Fourth Amendment based complaints are without merit."
777 So.2d at 755-60.
Contrary to the appellant's contention, Hammonds is directly applicable to this case. Although Hammonds involved the taking of a DNA sample from a convicted felon under § 36-18-24(a) and (b), the Fourth Amendment analysis in Hammonds is equally applicable to all DNA sampling under § 36-18-24. In this case, the appellant was subject to having a sample of his DNA taken pursuant to §§ 36-18-24(c) and (e). Section 36-18-24(c) provides that the DNA database shall include DNA samples of "[p]ersons convicted after May 6, 1994 of any offense contained in Chapter 6, Title 13A." Section 36-18-24(e) provides that the DNA database shall include DNA samples of "[p]ersons convicted or sentenced after May 6, 1994, for any of the offenses enumerated above and serving *16 a sentence of probation." Although the appellant was not convicted of a felony, he was convicted of the misdemeanor offense of reckless endangerment and was sentenced to probation; the reckless-endangerment statute, § 13A-6-24, Ala.Code 1975, is found in Chapter 6 of Title 13A. Although the appellant's DNA sample was taken under different provisions in § 36-18-24 than those that were at issue in Hammonds, just as in Hammonds, the appellant's "rights pertaining to the seizure of his blood are outweighed by Alabama's interest in rapidly identifying repeat or habitually dangerous criminals." 777 So.2d at 760.
In addition, as to the appellant's argument that he had a right of refusal under § 36-18-25(b) and/or (d), we note that the appellant was subject to having a DNA sample taken pursuant to § 36-18-25(a), not subsection (b) or (d). Subsections (b) and (d) apply only to those persons "serving any sentence of probation" or "under any sentence of confinement" on May 6, 1994, the effective date of the act. The appellant was neither on probation nor in confinement on May 6, 1994; he was not convicted of reckless endangerment until 1999. Thus, those sections are not applicable to him.
Therefore, taking the appellant's DNA while he was on probation was not a violation of the Fourth Amendment; the trial court properly denied the appellant's motion to suppress the DNA evidence on that ground.

III.
Finally, the appellant contends that the trial court erred in denying his motion to dismiss the indictments against him for "want of prosecution." (Issues III and IV in the appellant's brief at p. 29.) In this regard, the appellant argues that he was denied a speedy trial because there was an approximately 3-year delay between the date of the crimesMay 3, 1997and the date he was arrestedApril 28, 2000and an additional 19-month delay between the date of his arrest and the date he entered his guilty pleasDecember 6, 2001.
In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court held that when determining whether an accused has been denied his right to a speedy trial, a court must look at: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant's case.
The appellant argues that his right to a speedy trial was triggered on May 3, 1997, when he committed the crimes, and that, therefore, the length of the delay in this case was approximately four years and seven months. However, it is well settled that "[t]he right to a speedy trial is triggered when a criminal prosecution has begun." Ex parte Carrell, 565 So.2d 104, 107 (Ala.1990).
"`The protection of the Sixth Amendment is triggered when a criminal prosecution has begun and extends only to those persons who have been "accused" in the course of that prosecution. United States v. Marion, 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468(1971). "[I]t is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." Id. at 320, 92 S.Ct. at 463.'"
Steeley v. City of Gadsden, 533 So.2d 671, 678 (Ala.Crim.App.1988), quoting Hayes v. State, 487 So.2d 987, 991 (Ala.Crim.App. 1986). "`Prearrest delay may give rise to a due process claim, but only delay following formal accusation or delay subsequent *17 to arrest are considered in evaluating a claim under the U.S. Sixth Amendment speedy trial clause.'" Steeley, 533 So.2d at 678, quoting Serna v. Superior Court, 40 Cal.3d 239, 251, 219 Cal.Rptr. 420, 427, 707 P.2d 793, 806 (1985). Therefore, contrary to the appellant's contention, his right to a speedy trial was not triggered on the date of the crimes.[2]
The State takes the position that the appellant's right to a speedy trial was triggered on April 7, 2000, when the delinquency petitions were initially filed against him in the juvenile court. For purposes of this opinion, we will assume, without deciding, that the State is correct and that the date the delinquency petitions were filed, which is the date most favorable to the appellant's claim, is the starting point for our analysis.[3]
To trigger a speedy-trial analysis, the delay in bringing an accused to trial must be so excessive as to be "presumptively prejudicial." Barker, 407 U.S. *18 at 530, 92 S.Ct. 2182. "Unless the delay is presumptively prejudicial, there is no need to inquire into the other Barker factors." Roberson v. State, 864 So.2d 379 (Ala. Crim.App.2002). "[W]hether the length of delay is presumptively prejudicial is `necessarily dependent upon the peculiar circumstances of the case.'" Nickerson v. State, 629 So.2d 60, 64 (Ala.Crim.App. 1993), quoting Barker, 407 U.S. at 531, 92 S.Ct. 2182. As noted above, the delinquency petitions were filed against the appellant on April 7, 2000; he pleaded guilty on December 6, 2001. In total, there was a 20-month delay. Delays equal to or longer than the 20 months at issue here have been held not to be presumptively prejudicial. See Ex parte Payne, 683 So.2d 458 (Ala.1996)(25-month delay was not presumptively prejudicial); Campbell v. State, 709 So.2d 1329 (Ala.Crim.App. 1997)(26-month delay was not presumptively prejudicial); Weaver v. State, 678 So.2d 260 (Ala.Crim.App.1995)(29-month delay not presumptively prejudicial), rev'd on other grounds, 678 So.2d 284 (Ala.1996); and Arnett v. State, 551 So.2d 1158 (Ala. Crim.App.1989)(20-month delay was not presumptively prejudicial). However, in other cases, similar delays have been found to be presumptively prejudicial. See Mansel v. State, 716 So.2d 234 (Ala. Crim.App.1997)(26-month delay was presumptively prejudicial); Howard v. State, 678 So.2d 302 (Ala.Crim.App.1996)(29-month delay was presumptively prejudicial); Ingram v. State, 629 So.2d 800 (Ala. Crim.App.1993)(19-month delay was presumptively prejudicial); and Beaver v. State, 455 So.2d 253 (Ala.Crim.App. 1984)(16-month delay was presumptively prejudicial). Therefore, without making a specific finding of whether the 20-month delay was presumptively prejudicial, we find it prudent to look at the remaining Barker factors.
As for the reasons for the delay, we note that purposeful and deliberate delay by the prosecuting authority is weighed more heavily against the State than unexcused inaction. See, e.g., Ex parte Clopton, 656 So.2d 1243 (Ala.1995), and Wheat v. State, 662 So.2d 1218 (Ala. Crim.App.1995). In addition, "`[d]elays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.'" Zumbado v. State, 615 So.2d 1223, 1234 (Ala.Crim.App.1993), quoting McCallum v. State, 407 So.2d 865, 868 (Ala.Crim.App.1981), quoting in turn Walker v. State, 386 So.2d 762, 763 (Ala. Crim.App.), rev'd in part and vacated in part, 860 F.2d 1091 (11th Cir.1988). This case is unique in that the majority of the 20-month delay16 months, in factcannot be weighed in favor of or against either the State or the appellant.
As stated previously, the appellant was charged in delinquency petitions on April 7, 2000; the juvenile court transferred the case to the circuit court for prosecution of the appellant as an adult one month later, on May 10, 2000; the appellant filed a notice of appeal, and this Court affirmed the transfer order on September 29, 2000; and the Alabama Supreme Court denied certiorari review and a certificate of judgment was issued on April 27, 2001. Approximately one month of the delay occurred between the delinquency petitions' being filed and the juvenile court's transferring the case to the circuit court. The appellant's appeal from the transfer order accounted for another 11 months of the delay. In addition, approximately four months of the delay was due to the appellant's request for youthful-offender status. The record reflects that on June 26, 2001, the appellant filed an application for youthful-offender status, and the trial court ordered an investigation. The trial court *19 denied the application on November 6, 2001.
In Smelley v. State, 564 So.2d 74, 82-83 (Ala.Crim.App.1990), this Court held that the time between an accused's application for youthful-offender status and the trial court's denial of that application "should not be weighed against the State nor in favor of the appellant" because "the right to a speedy and public trial does not apply during the pendency of [a request to be treated as a youthful offender]." See also Kelley v. State, 568 So.2d 405 (Ala.Crim. App.1990). In addition, in Cruse v. State, 489 So.2d 694, 697 (Ala.Crim.App.1986), this Court held that "[s]ince a transfer hearing is not a `criminal prosecution' within the meaning of the constitutional guaranty of the Sixth Amendment right to a speedy trial, that right does not apply to transfer hearings." Therefore, the month between the filing of the delinquency petitions and the transfer of the case to circuit court and the approximately four months from the appellant's filing of his application for treatment as a youthful offender and the trial court's denial of that application should not be weighed in favor of or against either the State or the appellant. Likewise, the 11 months while the appellant's appeal from the juvenile court's transfer order was pending should also not be weighed in favor of or against either the State or the appellant because the circuit court did not have jurisdiction to adjudicate the merits of the case, either by trial or by accepting a plea, while the appeal from the transfer order was pending. See Ex parte Webb, 843 So.2d 127 (Ala.2002)(holding that a circuit court does not have jurisdiction to adjudicate the merits of a criminal charge while an appeal of an order transferring the case from juvenile court to circuit court was pending).
As for the remaining four months of the 20-month delaythe three months immediately following the Supreme Court's denial of certiorari review of the transfer order and the one month after the trial court denied the appellant's application for youthful-offender statusthe record indicates that various pretrial motions were filed by the appellant and disposed of by the trial court. This delay was neither unreasonable nor unexpected in a criminal prosecution.
As for the third Barker factor the appellant's assertion of his rightthe record reflects that the appellant never asserted his right to a speedy trial and that he did not file his motion to dismiss the indictments on the ground that he was denied a speedy trial until the day he entered his pleas. "Failure to assert the right makes it difficult for a defendant to establish that he was denied a speedy trial." Wooden v. State, 822 So.2d 455, 457 (Ala.Crim.App.2000).
Finally, the appellant has failed to show any prejudice as a result of the delay. "Barker set out three interests that the right to speedy trial was intended to protect and by which the level of prejudice is to be measured: (1) `to prevent oppressive pretrial incarceration'; (2) `to minimize anxiety and concern of the accused'; and (3) `to limit the possibility that the defense will be impaired.'" Kimbrell v. State, 659 So.2d 1039, 1041 (Ala.Crim.App. 1995), quoting Barker, 407 U.S. at 532, 92 S.Ct. 2182. Although the appellant makes a bare allegation that he was prejudiced by the delay because, he says, he "was put in a position to contact neighbors (many of wh[om] had moved) and ask them to recall events from a singular day three years ago," he has not shown, nor even alleged, that any of those neighbors would have been beneficial to his defense. (Appellant's brief at p. 30.)
*20 In addition, the appellant also contends that he was prejudiced by the delay because, he says, he received a "harsher sentence" as a result of the delay. (Appellant's brief at p. 31.) Specifically, he argues that on March 21, 2001, the Alabama Board of Pardons and Paroles adopted new rules that changed the time an inmate convicted of rape (among other violent crimes) must serve in prison before becoming eligible for parole consideration from 1/3 of the total length of the sentence or 10 years, whichever is less, to 85 percent of the total length of the sentence or 15 years, whichever is less. Had he been prosecuted sooner, the appellant maintains, he would have been subject to the "old rules" and would only have to serve 1/3 of his sentences (approximately 8.3 years) before being eligible for parole consideration instead of 15 years. Although certainly novel, this argument has no merit.
Initially, we note that this type of alleged prejudice does not fall within the three types of prejudice that have historically been the focus of the speedy-trial analysisi.e., oppressive pretrial incarceration, anxiety and concern of the accused, and impairment of the defense. However, both this Court and the Alabama Supreme Court have expanded the prejudice prong of the speedy-trial analysis beyond those three considerations. See Ex parte Archer, 643 So.2d 601 (Ala.1992)(noting that adverse effects on parole consideration, eligibility for work release and other prison programs, and place of confinement can be sufficient to establish prejudice); Ex parte Slaughter, 377 So.2d 632 (Ala.1979)(same); and Austin v. State, 562 So.2d 630 (Ala. Crim.App.1989)(same). Thus, we address the appellant's allegation of prejudice in this regard.
Contrary to the appellant's contention, a change in rules regarding the date an inmate becomes eligible for parole consideration does not affect the length of the inmate's sentence (although it could possibly affect the length of an inmate's incarceration); the appellant did not receive a "harsher sentence" as a result of the change in the rules.[4] In addition, the appellant's claim that he will be prejudiced by the application of new rules to him ignores the fact that parole is a privilege, not a right. There would be no guarantee under any set of rules that the appellant would, in fact, be granted parole after serving only 1/3 of his sentences. Because the appellant has not shown that he would, in fact, be paroled sooner under one set of rules than he would under another set of rules, he has failed to establish that the delay in prosecution prejudiced him.
*21 After carefully considering and weighing all of the Barker factors, we conclude that the appellant was not denied his right to a speedy trial. Thus, the trial court properly denied his motion to dismiss the indictments.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
NOTES
[1] The juvenile court found the appellant to be indigent when the delinquency petitions were first filed against him and he was appointed counsel to represent him. Later, the appellant's family retained counsel on the appellant's behalf. After his pleas, the appellant was again found to be indigent by the trial court for purposes of appeal.
[2] Although the appellant does not argue in terms of due process, we note that there was no due process violation as a result of any prearrest or preindictment delay.

"The United States Supreme Court has stated that the `Due Process Clause had a limited role to play' in protecting against the prejudice caused by a preindictment delay. United States v. Lovasco, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977), quoted in State v. Prince, 581 So.2d 874, 877 (Ala.Cr.App.1991). `A defendant is charged with a heavier burden of proof in showing a preindictment delay due process violation than in showing a denial of his speedy trial rights.' Stoner v. State, 418 So.2d 171, 180 (Ala.Cr.App.), cert. denied, 418 So.2d 184 (Ala.1982), cert. denied, 459 U.S. 1128, 103 S.Ct. 764, 74 L.Ed.2d 978 (1983). `In order to establish a due process violation due to preindictment delay, a defendant must show "(1) that the delay caused actual prejudice to the conduct of his defense, and (2) that the delay was the product of deliberate action by the government designed to gain a tactical advantage." United States v. Lindstrom, 698 F.2d 1154, 1157-58 (11th Cir.1983).' Prince, 581 So.2d at 878. A defendant seeking to establish the first prong necessary to show a due process violation from the delay `must show "actual prejudice, not the mere possibility of prejudice, and that the delay caused substantial prejudice to [the defendant's] rights to a fair trial."' Id., quoting Stoner, 418 So.2d at 180. `[P]assage of time per se is not a constitutional violation.' Stoner, 418 So.2d at 180, quoting Lovasco, supra."
R.D.H. v. State, 775 So.2d 248, 250-51 (Ala. Crim.App.1997). The appellant has not shown that the prearrest/preindictment delay caused actual prejudice to his defense or that the delay was deliberate on the part of the State in order to gain a tactical advantage.
[3] We note, however, that an adjudication of delinquency is not considered to be a criminal conviction. See § 12-15-72(a), Ala.Code 1975, and Chambers v. State, 497 So.2d 607 (Ala.Crim.App.1986). Yet, as previously noted, the protection of the Sixth Amendment is triggered when a criminal prosecution has begun and extends only to those persons who have been accused in the course of that prosecution. Because, as discussed later in this opinion, the appellant's claim is clearly without merit, regardless of the date on which his Sixth Amendment right may have been triggered, we pretermit any discussion as to exactly when the right to a speedy trial attaches in cases such as this case where the proceedings leading up to criminal prosecution and conviction were put in motion by the filing of a delinquency petition, i.e., cases involving the initiation of delinquency proceedings in juvenile court and the subsequent transfer of the juvenile case to circuit court for criminal prosecution. In other words, we need not decide exactly when the appellant's speedy-trial right was triggered in this case, which would be an issue of first impression in this State, because our conclusion with respect to the appellant's speedy-trial claim would be no different, regardless of whether the appellant's right was triggered when the delinquency petitions were filed, when he was arrested on those petitions, when the case was transferred to circuit court for criminal prosecution, when the indictment was returned, or when the certificate of judgment was issued on the appellant's appeal from the juvenile court's transfer order.
[4] We point out that the appellant's reliance on North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), is misplaced. In Pearce, the United States Supreme Court stated that "it would be a flagrant violation of the Fourteenth Amendment for a state trial court to follow an announced practice of imposing a heavier sentence upon every reconvicted defendant for the explicit purpose of punishing the defendant for his having succeeded in getting his original conviction set aside," and that "the imposition of a penalty upon the defendant for having successfully pursued a statutory right of appeal or collateral remedy would be no less a violation of due process of law." 395 U.S. at 723-24, 89 S.Ct. 2072 (footnote omitted). Pearce dealt with judicial vindictiveness "manifesting itself in the form of increased sentences upon conviction after retrial." Chaffin v. Stynchcombe, 412 U.S. 17, 24, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973). The appellant, however, was tried for his crimes only once and received only one sentence for each of his crimes. Although he was transferred from juvenile court to circuit court, the transfer hearing was not a conviction and the change in parole rules was not a "penalty" imposed on the appellant for having pursued his right to appeal the transfer order. Therefore, Pearce has no application to this case.